UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


CIVIL ACTION NO. 15-7158     SECTION "H"


LUKE LIBERTO

VERSUS

CITY OF MANDEVILLE, RICK RICHARD AND
DETECTIVE JASON READEAU


DEPOSITION OF LUKE LIBERTO,

FOLSOM, LOUISIANA, TAKEN IN THE OFFICES OF

JOHN M. ROBIN, ESQ., 600 COVINGTON CENTER,

COVINGTON, LOUISIANA 70433, ON TUESDAY,

AUGUST 16, 2016, COMMENCING AT 10:06 A.M.


CURE, KNAAK & BELL, INC.

(504) 524-2224

1      Q.   All right.  How long you been

2  there?

3      A.   Right at a year.

4      Q.   And where's that located?

5      A.   Highway 21.

6      Q.   In Folsom?

7      A.   In Covington.

8      Q.   Covington, okay.  All right.  How

9  far did you go in school?

10      A.   Some college.

11      Q.   Where did you graduate high

12  school?

13      A.   Mandeville High School.

14      Q.   What year was that?

15      A.   1999.

16      Q.   All right.  Do you know Jason

17  Readeau?

18      A.   Now I do.

19      Q.   Did you know him prior to

20  January 17th, 2015?

21      A.   No, sir.

22      Q.   You never had any dealings with

23  him at all?

24      A.   Not that I recall.

25      Q.   All right.  This incident

1    Q.   All right.  So roughly 14 months?

2    A.   And I may have to check that.  I'm

3    pretty sure those are the dates.  Those are

4    pretty significant dates.

5    Q.   I understand.  All right.  So the

6    relationship you had with Ms. Bailey, there

7    was never a time prior to this night of

8    January 17th where the police ever had to

9    become involved?

10   A.   No, sir.

11   Q.   Okay.  Was there any time between

12   the early part of January when you broke off

13   the committed relationship and January 17th

14   of 2015 where she accused you of either

15   trying to force intimacy on her or anything

16   like that?  In other words, did she accuse

17   you of anything like that?

18   A.   Not -- there was no accusation

19   that I recall.

20   Q.   All right.  Was there anything

21   about her that gave you cause to believe

22   that she was a manipulator or anything like

23   that?  Do you understand my question?

24   Someone likes to kind of cause trouble?

25   A.   No, not at the time.

1      Q.    Okay.  What do you mean by not at

2  the time?

3      A.    Not until, not until the actual

4  incident happened, then I connected the

5  dots.

6      Q.    I got you.  All right.  Just to

7  back up a bit, do you know Rick Richard?

8      A.    I do not.

9      Q.    All right.

10     A.    Let me, let me rephrase that.  I,

11  I know who he is.

12     Q.    Okay.  You knew he was the Chief

13  of Police of Mandeville?

14     A.    Correct.

15     Q.    But you had never had any personal

16  involvement with him at all or knew him?

17     A.    No, sir.

18     Q.    The prior conviction, and maybe

19  other traffic incidents, were those

20  involving the Mandeville Police Department?

21     A.    Not that I recall.

22     Q.    All right.  Did you ever have

23  anything that sticks out in your mind that

24  you feel was a problem with the Mandeville

25  Police Department?  And I mean, what I mean

Page 28

1      Q.   And this foreplay, as you said,

2  did it lead to something else?

3      A.   It led to intercourse.

4      Q.   And again at any point, did she

5  stop and say that she was not giving you

6  consent or that she wanted it to stop?

7      A.   No, sir.

8      Q.   All right.  And yourself, you went

9  ahead voluntarily and --

10     A.   I actually -- I actually stopped.

11     Q.   Okay.  So at some point while you

12 all are having intercourse, you decide to

13 stop?

14     A.   She -- yes.

15     Q.   What made you stop?

16     A.   She made a statement as to, "You

17 know this means" -- and this is, this is not

18 verbatim.

19     Q.   Sure.

20     A.   Okay?  She said, "You know this

21 means that we're more than just friends."

22 And...

23     Q.   How did you take that?

24     A.   I took that kind of -- it made me

25 feel really uncomfortable, because I thought

Page 33

```
 1        Q.    Do you remember what those were?

 2        A.    She started saying, "You raped me.

 3   I was, I was asleep.  How could you do

 4   that?"  Things of that nature.  Once again

 5   verbatim --

 6        Q.    Sure.

 7        A.    -- I don't -- you know, but to

 8   that.

 9        Q.    Do you know whether or not your

10   sister heard any of the discussions you all

11   were having or the threats she was making?

12        A.    I am not sure.

13        Q.    Okay.  Have you had conversations

14   since all this has occurred with your sister

15   where she might have told you that she heard

16   some things?

17        A.    She -- we've discussed it many

18   times.  And she had no idea there was

19   anything going on that night, that there was

20   any kind of disagreement or...

21        Q.    All right.  So let's get back to

22   when you're in the room and she starts

23   saying you raped me.  Did she in saying that

24   to you, did she say I'm going to go tell

25   somebody that, or she just started accusing
```

CURE, KNAAK & BELL, INC.
(504) 524-2224

Page 35

```
 1      A.    Not that night.  I just went to

 2   the other room.  It was one a.m.

 3      Q.    Okay.  So you go in the other

 4   room.  Did y'all start text messaging then?

 5      A.    Uh-huh (affirmative reply).  Yes,

 6   sir.

 7      Q.    Okay.  So while you're both in the

 8   house, you start text messaging?

 9      A.    Yes, sir.

10      Q.    She send you a text message, or

11   you send her one first?  Do you remember?

12      A.    Don't remember.

13      Q.    All right.  What was the gist of

14   the text messages back and forth?

15      A.    Her accusing me of saying that

16   I -- that she was sleeping and that I forced

17   myself on her.

18      Q.    Okay.

19      A.    I think, I think in the text

20   messages -- I have them all printed out, I

21   believe.  I don't know.

22      Q.    You have all those?

23      A.    I'm pretty sure we have all the

24   text messages.

25      Q.    All right.  If you all could
```

Page 36

1   produce those, that would be good.

2       A.   So I, I don't recall exactly what

3   they said.

4       Q.   Okay.  I'm not going to hold you

5   to them.  If you've got them printed out, we

6   can look at them.  I'm just asking you what

7   you remember as you sit here.

8       A.   Yes, sir.

9       Q.   Is it fair to say the text

10  messages is more, from what you remember,

11  her accusing you?  And what did you say back

12  to her?

13      A.   "I can't believe you're -- I can't

14  believe you're saying this."  You know, to

15  that extent, I was like, "Are you serious

16  right now?  Are you, are you really going to

17  sit here and tell me that?"

18      Q.   At any point did you go talk to

19  your sister that night?

20      A.   No, I did not.

21      Q.   Okay.  The niece and nephew, are

22  they in the house as well at the time?

23      A.   I think.  I'm not sure.

24      Q.   Okay.

25      A.   Not sure.

1        A.    Right.

2        Q.    Do you remember when you were --

3   well, let me ask you.  Were you -- was it

4   explained to you that they were there for a

5   particular reason?

6        A.    I believe.  I believe he told me

7   it was for simple rape.

8        Q.    Okay.  And when you say he, who

9   are you referring to?

10       A.    Jason Readeau, that he had a

11  warrant signed by the judge.

12       Q.    Okay.  You remember Jason Readeau

13  specifically telling you that?

14       A.    I'm not sure if it was

15  specifically him, but I think so.

16       Q.    Okay.  What did you think when you

17  heard that?

18       A.    I thought this is crazy.

19       Q.    Did you all have a conversation

20  about it, or did they just simply say, "Hey,

21  we got a warrant for your arrest," and that

22  was it?

23       A.    I think I said something to the

24  effect like, "If I tell you my side of the

25  story, is it going to make a difference?"

1     Q.    Uh-huh.

2     A.    And he said something to the

3   effect of, "I don't think so," or, "No."  It

4   was a negative response, from what I recall.

5   And my response to that was, well, then I

6   have nothing to say to you until I have my

7   attorney present.

8     Q.    Okay.  That all occurred in the

9   bedroom or in the living room?

10    A.    In the living room.

11    Q.    Okay.  Prior to your finding out

12  that they were there to arrest you, did you

13  have any other discussions with them that

14  you remember?  In other words, did they ask

15  you a bunch of questions, then say, oh, by

16  the way, we're here to arrest you?

17    A.    I think while they were -- Jason

18  was in the back collecting evidence or

19  whatever, there was another officer just

20  kind of standing there with a crazy look on

21  his face.  And when I say crazy, he just

22  looked like he wasn't sure of what was

23  really going on.

24    Q.    Uh-huh.

25    A.    And I, and I think I said

Page 46

1      something to him to the effect of, you know,

2      "What's, what's going on?"  You know,

3      "What's" -- I think this was before they

4      explained to me what they were going to

5      arrest me for.

6          Q.   Okay.

7          A.   He -- that guy didn't -- he just

8      kind of shrugged his shoulders.

9          Q.   Okay.

10         A.   From what I recall, he didn't

11     really say anything.

12         Q.   When you asked if it would make a

13     difference and you got the negative

14     response, whatever it was, what happened

15     then?  They put handcuffs on you or what?

16         A.   I had my, my little -- that was

17     the other person that was in the house, my

18     little niece.  She was, I guess, two at the

19     time.  She was up and running around.  And

20     he did me the courtesy of not putting

21     handcuffs on me in front of her.  He walked

22     me outside and did it.

23         Q.   Okay.

24         A.   And that's -- and they took me to

25     the car from there.

Page 47

1      Q.    Okay.  Did, did you ever resist

2    them at all?

3      A.    No, sir.

4      Q.    All right.  Did y'all ever have

5    any kind of physical struggle at all?

6      A.    No, sir.

7      Q.    So they put the handcuffs on you

8    and put you into a police car?

9      A.    Yes, sir.

10      Q.    Were you placed into a marked unit

11    or an unmarked unit?

12      A.    I'm not sure.

13      Q.    Okay.

14      A.    I, I think it was a marked unit,

15    but I'm not sure.

16      Q.    All right.  Were you in the rear

17    of the unit?

18      A.    Yes, sir.

19      Q.    Okay.  Was your sister present for

20    when you were arrested?

21      A.    Yes, sir.

22      Q.    Did they interview her that you

23    know of?

24      A.    Not that I know of.

25      Q.    Okay.  They then took you to

1    where?  Mandeville police?

2         A.   Mandeville police station,

3    correct.

4         Q.   All right.  And what happened

5    there?

6         A.   They put me in a holding cell.

7         Q.   All right.  Did they ever ask to

8    interview you?

9         A.   Yes.

10        Q.   And you told them what?

11        A.   I told them that I was not

12   comfortable answering any questions until my

13   attorney was present.

14        Q.   Was there any type of physical

15   altercation there at the police department?

16        A.   No, sir.

17        Q.   Do you feel like anyone physically

18   abused you during the arrest?

19        A.   No, sir.

20        Q.   Okay.  At some point you were

21   taken to St. Tammany lockup?

22        A.   Yes, sir.

23        Q.   How long did that take; do you

24   know?

25        A.   I'm not really sure.  I'd say

Page 49

1    maybe an hour or two.

2        Q.    All right.  Did anything happen

3    while you were at the Mandeville Police

4    Department that sticks out in your mind that

5    was either unprofessional or something that

6    shouldn't have happened?

7        MR. ROBIN:

8              Object to the form of the

9    question.

10   BY MR. DETWEILER:

11       Q.    You understand my question?

12       A.    Not really.

13       Q.    Did anyone at the Mandeville

14   Police Department do anything to you, say

15   anything to you that you think was either

16   unprofessional or out of line while you were

17   being booked?

18       A.    I wouldn't -- I can't really

19   answer that question to say, because I

20   don't -- I'm not familiar with the protocol

21   of how you --

22       Q.    Right.

23       A.    -- how they treat people --

24       Q.    Well, I'll give you an example.

25       A.    -- or arrest people.  You

Page 50

1   understand what I'm saying?

2        Q.   I've had people say that, you

3   know -- I have one case where the allegation

4   is that someone whistled the theme of the

5   Good, Bad and the Ugly, you know --

6        A.   Oh, no.

7        Q.   -- like, you know, in a menacing

8   way and -- or that someone, you know,

9   laughed at them or jeered at them and made

10  fun of them because they were under arrest

11  or yelled at them, you know, just mistreated

12  the arrested person.  So I'm just asking if

13  any of those types of things may have

14  happened to you?

15       A.   No.  No, I don't believe so.  Not,

16  not, not -- not that was -- it was a very

17  somber thing, you know.  I think he was --

18  he seemed kind of irritated that I wouldn't

19  give him a statement or answer his questions

20  then.

21       Q.   I understand.  Being arrested,

22  it's an uncomfortable process.

23       A.   To me.  Yeah, yeah.  Everything --

24       MR. ROBIN:

25            Uncomfortable?

1        MR. DETWEILER:

2            Right.

3        THE WITNESS:

4            Everything, everything seemed --

5        MR. DETWEILER:

6            Not pleasant.

7        THE WITNESS:

8            Everything seemed out of, out of

9    whack at that time.  Everything seemed like,

10   like I was being screwed over.  Pardon my

11   French.  It just --

12   BY MR. DETWEILER:

13       Q.   Right.  I understand.  All right.

14   So then you're transported to St. Tammany?

15       A.   Uh-huh (affirmative reply).

16       Q.   You were processed into

17   St. Tammany?

18       A.   Yes.

19       Q.   At some point you got to speak

20   with your attorney?

21       A.   Yes.

22       Q.   And that was Mister -- is it

23   Linder?

24       A.   Lindner, John Lindner.

25       Q.   All right.  And he advised you

Page 52

1    while you were in the lockup?

2        A.    Yes, sir.

3        Q.    Okay.  At some point you and your

4    attorney met with Jason Readeau?

5        A.    Correct.

6        Q.    Detective Readeau.  And you then

7    gave a statement?

8        A.    Yes.

9        Q.    You were advised of your rights?

10       A.    Yes, sir.

11       Q.    And your attorney counseled you as

12   you -- prior to or as you gave the

13   statement --

14       A.    Yes.

15       Q.    -- correct?

16       A.    Correct.

17       Q.    All right.  Did you have an

18   expectation of what might happen once you

19   gave your statement?

20       A.    I thought they were going to let

21   me go.

22       Q.    Okay.  And why is that?

23       A.    Because it was total bogus

24   allegation.

25       Q.    All right.  What was your

1    understanding of what she was accusing you

2    of?

3         A.    With what they charged me with,

4    simple rape.

5         Q.    Okay.

6         A.    That.

7         Q.    Did you -- did they give you any

8    specific details that she gave them?

9         A.    I don't really remember.  I do

10   remember him -- I think he read the report

11   of what she said to me.  And I just remember

12   it just being a whole lie, you know.  And I

13   think I might have even laughed at some

14   point.  I'm like, "Are you serious?"

15        Q.    Okay.  Were you made aware that

16   she went to the police station that night

17   and made a complaint against you that you

18   had performed some unwanted sex act --

19        A.    Not --

20        Q.    -- on her?

21        A.    Not till after I was arrested.

22        Q.    But at some point you learned that

23   she actually went and made a complaint

24   against you --

25        A.    Uh-huh (affirmative reply).

Page 54

1       Q.    -- on the night of January 17th?

2       A.    Correct.

3       Q.    And she made the complaint to the

4    police department to Detective Readeau that

5    you had performed some sex act on her

6    without her consent.  Would that be fair to

7    say?

8       A.    That, that I was aware that she

9    did that?

10      Q.    Yes.  In other words, that she

11   made that allegation against you?

12      A.    Yes.  Yes.

13      Q.    Okay.

14      A.    Yes.

15      Q.    And I'm not holding you to the

16   specifics, but you know that sitting here

17   today, you know she went to the police

18   department that night and she complained

19   that you performed some sex act without her

20   consent?

21      A.    Okay.

22      Q.    That's what she told the police?

23      A.    Right.

24      Q.    Would you agree with that?

25      A.    Yeah.  Yes, I would agree with

Page 57

1       Q.   Yeah.  I mean, you gave your

2    statement, and then you went back to the

3    lockup?

4       A.   Yes.

5       Q.   All right.  Did you ever see Jason

6    Readeau again?

7       A.   No, not after that.  During --

8    okay.  Never mind.  I never saw him again

9    after that.

10      Q.   Okay.  Did you ever see Chief

11   Richard during this whole process of your

12   being arrested?

13      A.   Not that I recall.

14      Q.   Did you have any interaction with

15   him at all?

16      A.   No.

17      Q.   Do you know whether or not he was

18   consulted regarding your arrest?

19      A.   I am not sure.

20      Q.   All right.  You have no knowledge

21   of it --

22      A.   No, sir.

23      Q.   -- whatsoever?  All right.  Do you

24   know why you sued Chief Richard?

25      A.   Because I -- I'm not sure.  I

Page 58

1    assume that he's the chief and should be

2    watching what his deputies and detectives

3    are doing.

4         Q.   Okay.  All right.  But as far as

5    his personal involvement, you have no

6    knowledge of him personally being involved

7    in your, in your arrest or the decision to

8    keep you in jail?

9         A.   I'm not sure.

10        Q.   All right.  And Detective Readeau

11   you sued for false arrest?

12        A.   Yes.

13        Q.   Okay.  And why, why do you claim

14   that it was a false arrest?

15        A.   I would say because he didn't

16   investigate the case.

17        Q.   All right.  So you're -- you think

18   he should have gotten your side and maybe

19   talked to some other people before he made a

20   decision whether to arrest?

21        A.   Most definitely.

22        Q.   Have you had any contact with

23   Lavita Bailey since your arrest?

24        A.   No, sir.

25        Q.   You haven't --

Page 59

1      A.   Well, she --

2      Q.   -- spoken to her?

3      A.   She sent -- like there's a little

4  game, like a app or something where she sent

5  a free spin or something to me.  And I, I

6  think I took a screen shot of it and saved

7  it.

8      Q.   Like on Facebook?

9      A.   Like an app on the phone.  Like an

10 application on the phone.

11     Q.   All right.  Have you had any

12 discussions with her since January 17th,

13 2015?

14     A.   No, sir.

15     Q.   Was she involved in any way with

16 the decision not to prosecute you, that you

17 know of?

18     A.   Say again.

19     Q.   Do you know whether she was

20 involved in the decision not to prosecute

21 you?

22     A.   I do not know.

23     Q.   Okay.  At some point you went to

24 court for this charge?

25     A.   Yes.

1      Q.   And at the time you were

2   represented by Mr. Lindner?

3      A.   Yes, sir.

4      Q.   Okay.  And as I understand it,

5   there was a preliminary hearing.  Do you

6   remember that?

7      A.   I believe so, yes.

8      Q.   All right.  Do you know what

9   occurred during that preliminary hearing?

10      A.   Vaguely.

11      Q.   All right.  If I told you it

12   occurred on February 6th, 2015, does that

13   sound ballpark?

14      A.   Yeah, that sounds -- I mean, yes.

15      Q.   Do you remember being in court?

16      A.   (Nods head.)

17      Q.   Do you remember there being a

18   stipulation to the affidavit of the arrest

19   warrant and the police report?

20      A.   These things I am not sure of.

21      Q.   Okay.  That would be something

22   that your attorney would have handled?

23      A.   Yes, sir.

24      Q.   Do you remember the Court making a

25   finding of probable cause?

Page 61

1       A.   I am not sure.

2       Q.   Do you remember whether or not the

3   Judge decided that probable cause existed

4   for sexual battery and not the simple rape?

5       A.   Possibly.  I think that's, I think

6   that's what, what she said, that there was

7   no probable cause for simple rape but

8   possibly based on the information she had

9   for sexual battery.

10      Q.   Okay.  And again I'm --

11      A.   And I'm, I'm not saying that

12  I'm --

13      Q.   I'm not holding you to this.

14      A.   Okay.

15      Q.   I'm asking you what you remember.

16      A.   Okay.

17      Q.   That's all I'm asking you.  The

18  documents bear it out.  Okay?  Do you

19  remember being in court and the Judge, once

20  finding probable cause, determined that your

21  bail would be set?

22      A.   Yes, sir.  She, she set my bail I

23  believe at 25,000.

24      Q.   Okay.  Was there any hearing

25  regarding the amount of your bail?

Page 62

1      A.    I'm not sure.

2      Q.    All right.  Do you remember any

3  discussions whether or not your attorney

4  said it needed to be lower or anything like

5  that?

6      A.    I'm not sure.  I mean, it -- yeah.

7  No.  I'm not sure.

8      Q.    Okay.  I'm just asking you what

9  you remember.  At some point did you become

10  aware of what your bail was?

11      A.    Yes, sir.

12      Q.    All right.  And it was $25,000?

13      A.    Yes, sir.

14      Q.    Were there any restrictions put on

15  your ability to bond out?

16      A.    Yes.

17      Q.    And what were those restrictions?

18      A.    I had a parole hold.

19      Q.    All right.  Who put that parole

20  hold in place?

21      A.    The Department of Corrections, I

22  assume.  I'm not sure.

23      Q.    Okay.  Did Jason Readeau have any

24  involvement with putting the parole hold?

25      A.    I do not know.

```
 1        Q.   All right.  Was he consulted or
 2   was he brought into court to talk about your
 3   bail?
 4        A.   Not that I'm aware of.
 5        Q.   Did he ever testify at any of the
 6   court hearings that you attended?
 7        A.   No, sir.  I do not believe so.  I
 8   mean, I never, I never heard him testify to
 9   anything.
10        Q.   All right.  Did you ever meet with
11   the District Attorney's Office to discuss
12   whether or not the charges would be pursued?
13        A.   I don't recall ever meeting, me
14   personally, with the District Attorney's
15   Office or anyone from there.
16        Q.   All right.  When the stipulation
17   was made on February 6th, 2015, who was the
18   district attorney that made that stipulation
19   with your attorney?
20        A.   On February 6th?
21        Q.   Right.
22        A.   I believe it was Julie Knight, I
23   believe.
24        Q.   Okay.  She's now your attorney in
25   this case?
```

Page 64

1      A.    John Robin is my attorney.

2      Q.    All right.  Julie Knight has

3   signed pleadings in this case?

4      A.    Okay.

5      Q.    Is she your attorney in this case?

6      A.    I'm -- I mean, she's co-counsel.

7      Q.    When did you hire Julie Knight?

8      A.    I hired John Robin.

9      Q.    Okay.  Well, when did you hire

10  Julie Knight?

11     A.    I'm not sure how to answer the

12  question.

13     Q.    How did you find out that the

14  charges were not being pursued?

15     A.    Through communications with my

16  sister and my attorney.

17     Q.    Okay.  And your attorney at that

18  time was Mr. Lindner?

19     A.    Lindner, yes, sir.  John Lindner.

20     Q.    Okay.  Do you remember being

21  present on March 26th in court for an

22  Article 701 hearing?

23     A.    Yes.

24     Q.    All right.  What happened in that

25  hearing?

Page 65

```
 1        A.    The -- I think that was the, the

 2   hearing that had to do with them keeping me

 3   for so much time without actually filing

 4   charges or arraigning me.  And the Judge --

 5   they had to bring in the Attorney General,

 6   and he did not -- he didn't file formal

 7   charges, so the Judge relieved me of any

 8   bail.  She dropped the bail.

 9        Q.    Why was the Attorney General

10   brought in?

11        A.    A conflict of interest with the

12   D.A.'s office.

13        Q.    What was the conflict of interest?

14        A.    I played baseball with the head

15   prosecutor, Collin Sims.

16        Q.    You played baseball?

17        A.    Yes, sir.

18        Q.    With who?

19        A.    Collin Sims.

20        Q.    And he was with the D.A.'s office?

21        A.    Yes.

22        Q.    So at that point you were

23   released?

24        A.    No, sir.

25        Q.    What happened after the Article
```

Page 66

1   701 hearing?

2       A.   I still had a parole hold.

3       Q.   Okay.  And what happened with

4   that?

5       A.   My parole officer told me that her

6   supervisor would not lift the hold until the

7   charges were completely diffused, I guess,

8   since there -- since there wasn't formal

9   charges, she wanted -- they wanted to make

10  sure they weren't going to still press

11  charges before they released the hold.

12      Q.   All right.  Who was your parole

13  officer?

14      A.   Jena Hill.

15      Q.   Do you know who her supervisor

16  was?

17      A.   I am not sure.

18      Q.   You have any idea whether Jason

19  Readeau was consulted in the decision to

20  continue to hold you after the Article 701

21  hearing?

22      A.   I am not sure.

23      Q.   Do you know one way or another?

24      A.   What?  I'm sorry.

25      Q.   Do you know one way or another?

CURE, KNAAK & BELL, INC.
(504) 524-2224

1      A.   Whether he was involved?

2      Q.   Sure.

3      A.   I do not.

4      Q.   Do you know who Sergeant Vaughn

5  Whitehead is?

6      A.   I've heard of him, but if he

7  walked into the room, I'm not sure I would

8  recognize him.

9      Q.   Did you -- do you know whether he

10  had any involvement in your case at all?

11     A.   If he was one of the officers at

12  the house, possibly.

13     Q.   How about Corporal Glaudi?  Do you

14  know who that is?

15     A.   I do not know who that is.

16     Q.   All right.  How long did you

17  remain in jail?

18     A.   Approximately 85 days.  And that's

19  approximate.

20     Q.   Part of the allegations that

21  you've made is that you were trying to

22  reestablish a relationship with a daughter.

23     A.   Yes.

24     Q.   Is that correct?

25     A.   Yes.

Page 68

1      Q.    All right.  Tell me about your

2   daughter.  How old is she?

3      A.    She is now 15.

4      Q.    Fifteen years old?

5      A.    Fifteen years old.

6      Q.    Okay.  Tell me about your

7   allegation.  Your allegation is that because

8   you had gone back and become incarcerated

9   for 85 days, it interfered with your

10   relationship with her?

11      A.    Not so much that, but the actual

12   charge of what I was arrested for itself did

13   that.

14      Q.    Okay.  Tell -- explain that to

15   me --

16      A.    Okay.

17      Q.    -- because I know it's an element

18   of your damages.

19      A.    Okay.  Okay.  While I was

20   incarcerated prior to being paroled --

21      Q.    So back in 2013?

22      A.    Yes.

23      Q.    Okay.

24      A.    In that, in that time frame, my

25   parental rights were taken away because I

Page 76

1       A.    Well --

2       Q.    -- your back was exacerbated?

3       A.    I put my -- you know, the position

4    they put me in with my hands behind my back

5    in handcuffs in the back of the car trying

6    to hold myself up didn't help my back any.

7       Q.    Did they have to use force to

8    arrest you?

9       A.    I wouldn't say excessive force.

10      Q.    Well, describe for me the force

11   that you think they used to arrest you.

12      A.    Just, just putting my hands behind

13   my back.

14      Q.    Did you allow them?  Did you put

15   your hands behind your back and then they

16   cuffed you, or they had --

17      A.    Yes, sir.

18      Q.    -- to pull your hands?

19      A.    No.  When my hands were back

20   there, they pulled them together tighter.  I

21   think I had to ask them to loosen one of the

22   handcuffs, too.  It was...

23      Q.    Did they do that?

24      A.    When we got to the jail they did.

25      Q.    How far away from Mandeville were

Page 77

1   you, is the house you were living in from

2   the Mandeville Police Department?

3       A.   I'd say not even a mile.

4       Q.   Have you ever been treated for any

5   substance abuse?

6       A.   Yes, sir.

7       Q.   When was that?

8       A.   2006.

9       Q.   Where did you receive treatment?

10      A.   That was at Fontainebleau

11  Treatment Center.  And I've also gone to

12  like Truth 180.  I don't know if you're

13  familiar with that.

14      Q.   What is that?

15      A.   It's like a outpatient treatment.

16  The Court orders a lot of people to go

17  there, probation and parole order, a lot of

18  people to go there.

19      Q.   All right.  What substances were

20  you treated for?

21      A.   A heroin addiction.

22      Q.   Is that something you're dealing

23  with now?

24      A.   No, sir.  No.  Thirteenth made

25  three years that I've been good.

Page 78

1      Q.    Congratulations.

2      A.    Thank you.

3      Q.    If the probation or parole hold

4  had not been put in place by the Parole

5  Department, were you in a position to be

6  able to bond out?

7      A.    Not sure.  I personally was not.

8      Q.    Do you know whether or not you had

9  anyone that was, that was willing to maybe

10 put up the bond for you?

11     A.    Willing for sure.  Whether they

12 could've or not, I do not know.

13     Q.    Okay.  I think that's all the

14 questions I have.  I appreciate your time.

15     MR. ROBIN:

16         No questions.

17        (Deposition concluded 11:24.)

18

19

20

21

22

23

24

25

Page 79

```
 1              REPORTER'S PAGE

 2
                I, Julie M. Carroum, Certified
 3  Court Reporter in and for the State of
    Louisiana, the officer, as defined in Rule
 4  28 of the Federal Rules of Civil Procedure
    and/or Article 1434(B) of the Louisiana Code
 5  of Civil Procedure, before whom this
    proceeding was taken, do hereby state on the
 6  record:

 7              That due to the interaction in the
    spontaneous discourse of this proceeding,
 8  dashes (--) have been used to indicate
    pauses, changes in thought, and/or
 9  talkovers; that same is the proper method
    for a court reporter's transcription of
10  proceeding, and that the dashes (--) do not
    indicate that words or phrases have been
11  left out of this;

12              That any words and/or names which
    could not be verified through reference
13  material have been denoted with the phrase
    "phonetically spelled."

14

15      _____

        JULIE M. CARROUM, CCR, RPR
16      Certified Court Reporter
        Registered Professional Reporter

17

18

19

20

21

22

23

24

25
```

```
 1              REPORTER'S CERTIFICATE

 2        This certification is valid only for a
    transcript accompanied by my original
 3  signature and original required seal on this
    page.
 4
           I, Julie M. Carroum, Certified Court
 5  Reporter in and for the State of Louisiana,
    as the officer before whom this testimony
 6  was administered, do hereby certify that
    Luke Liberto after having been duly sworn by
 7  me upon authority of R.S. 37:2554, did
    testify as hereinbefore set forth in the
 8  foregoing 79 pages; that this testimony was
    reported by me in the stenotype reporting
 9  method, was prepared and transcribed by me
    or under my personal direction and
10  supervision, and is a true and correct
    transcript to the best of my ability and
11  understanding; that the foregoing transcript
    has been prepared in compliance with
12  transcript format guidelines required by
    statute or by the Rules of the Louisiana
13  Shorthand Reporter Board, and that I am
    informed about the complete arrangement,
14  financial or otherwise, with the person or
    entity making arrangements for deposition
15  services; that I have acted in compliance
    with the prohibition on contractual
16  relationships, as defined by the Louisiana
    Code of Civil Procedure Article 1434 and in
17  rules and advisory opinions of the board;
    that I have no actual knowledge of any
18  prohibited employment or contractual
    relationship, direct or indirect, between a
19  court reporting firm and any party litigant
    in this matter, nor is there any such
20  relationship between myself and a party
    litigant in this matter; that I am not of
21  counsel, not related to counsel or the
    parties herein, nor am I otherwise
22  interested in the outcome of this matter.

23     _____
       JULIE M. CARROUM, CCR, RPR
24     Certified Court Reporter (#85118)
       Registered Professional Reporter
25     August  22, 2016
```