# In The Matter Of:

*Luke Liberto v.*
*City of Mandeville, et al*

---

*Jason Redeaux*
*August 31, 2016*

---

*Gulf Reporting Service*

Original File 8-31-16 j. readeau.txt
Min-U-Script® with Word Index



EXHIBIT

A

1

1             UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF LOUISIANA

3

4  NO. 2:15-cv-07158               SECTION "H"

5

6                 LUKE LIBERTO

7                   VERSUS

8     CITY OF MANDEVILLE, RICK RICHARD
         AND DETECTIVE JASON READEAU

9

10

11

12     Deposition of DETECTIVE JASON READEAU, 74458

13  Delta Avenue, Covington, Louisiana, taken at the

14  offices of MANDEVILLE CID, 1923 JEFFERSON STREET,

15  MANDEVILLE, LOUISIANA, TAKEN ON WEDNESDAY,

16  AUGUST 31, 2016, COMMENCING AT 11:00 A.M.

17

18

19

20

21

22

23

24

25

MISSISSIPPI     LOUISIANA
228.222.4549    504.908.5417   *Gulf*REPORTING
SERVICE, LLC
LEADING THE SOUTH IN COURT REPORTING,
VIDEO, AND LITIGATION TECHNOLOGY

2

INDEX

                                                            PAGE

CAPTION .....................................1
APPEARANCES .................................3
AGREEMENT OF COUNSEL ........................4
REPORTER'S CERTIFICATE......................80

EXAMINATION

MR. ROBIN...................................5
MR. DETWEILER..............................69

RE-EXAMINATION

MR. ROBIN..................................78

EXHIBITS

#1.........................................64
#2.........................................64
#3.........................................78

MISSISSIPPI        LOUISIANA
228.222.4549       504.908.5417

*Gulf* REPORTING
SERVICE, LLC
LEADING THE SOUTH IN COURT REPORTING,
VIDEO, AND LITIGATION TECHNOLOGY

3

1    APPEARANCES:

2
             John M. Robin, APLC
3            BY:  John M. Robin
                  Julie M. Knight
4            600 Covington Center
             Covington, LA  70433
5            985-893-0370
             Johnmrobin@johnmrobinlaw.com
6            Julie@davidpaddison.com

7                    ATTORNEYS FOR PLAINTIFF

8
             Nielsen, Carter & Treas, LLC
9            BY:  Keith M. Detweiler
             3838 N. Causeway Boulevard
10           Suite 2850
             Metairie, LA  70002
11           504-837-2500
             Kdetweiler@nct-law.com

12                   ATTORNEYS FOR DEFENDANTS

13

14

15
     ALSO PRESENT:
16       KATIE ROBIN, John M. Robin, APLC

17
     REPORTED BY:  CRYSTAL BALLAST, CCR, RPR
18                 Certified Court Reporter

19

20

21

22

23

24

25

4

1                 AGREEMENT OF COUNSEL

2

3          It is stipulated and agreed by and between

4     Counsel that the testimony of the witness, DETECTIVE

5     JASON READEAU, is hereby being taken pursuant to

6     Notice under the Federal Rules of Civil Procedure

7     for all purposes permitted under law.

8

9          The witness waives the right to read and

10    sign the deposition.  The original is to be

11    delivered to and retained by John M. Robin for

12    proper filing with the Clerk of Court.

13

14         All objections, except those as to the form

15    of the questions and/or responsiveness of the

16    answers, are reserved until the time of the trial of

17    this cause.

18

19                    *   *   *   *   *

20

21         Crystal Ballast, Certified Court Reporter in

22    and for the State of Louisiana and Registered

23    Professional Reporter, officiated in administering

24    the oath to the witness.

25



5

1          DETECTIVE JASON READEAU, having been first

2    duly sworn, was examined and testified as follows:

3                         EXAMINATION

4    BY MR. ROBIN:

5          Q.   Could you give me your full name and address

6    for the record, please?

7          A.   Jason Joseph Readeau, 74458 Delta Avenue,

8    Covington, Louisiana 70435.

9          Q.   And what is your occupation?

10         A.   I'm a law enforcement officer.

11         Q.   And who are you employed by?

12         A.   Mandeville Police Department.

13         Q.   And were you employed in that capacity on

14   January 17, 2015?

15         A.   Yes.

16         Q.   Officially, what was your title?

17         A.   Detective.

18         Q.   Detective, okay.

19              And, as we sit here, can I call you

20   Detective Readeau?

21         A.   That's fine.

22         Q.   I'm John Robin and I represent Luke Liberto.

23              Give me your educational background, please.

24         A.   High school graduate, three semesters of

25   college, and Louisiana POST 2 Correction

6

1    Certification, Louisiana POST 1 Police Officer Basic

2    Certification, various other -- I mean, over

3    15 years, I've attended hundreds of hours of law

4    enforcement basic continuing education.

5        Q.   And give me your professional background.

6    Who do you work for?

7        A.   Four years active duty, United States Marine

8    Corps, and then St. Tammany Parish Sheriff's Office

9    for about seven-and-a-half years, and then

10   Mandeville Police Department since March of 2009.

11       Q.   While you were in the Marines, did you have

12   any type of like police-type work?

13       A.   Not military police.  I was a -- FAST

14   company, security forces, which is more of an

15   anti-terrorism force protection role; not

16   necessarily investigative.  It would apply more to

17   the operational and tactical aspect of law

18   enforcement.

19           We didn't do any investigations, but we --

20   the unit I was attached to functioned more -- as far

21   as law enforcement is concerned, it was more of a

22   SWAT team.

23       Q.   So any training you had in the Marine Corps

24   didn't really lend itself to --

25       A.   Not the investigatory side.

7

1    Q.   Like what you do now, police investigations?

2    A.   No, sir.

3    Q.   So the first training you had, as far as

4    doing police work, was after you left the Marines?

5    A.   Yes, sir.

6    Q.   Did you immediately go to the St. Tammany

7    Parish Sheriff's Office?

8    A.   Within about three months.  I got out in

9    February of '02, came home in March of '02, and then

10   went to work for the Sheriff's Office in July.

11   Q.   And in what capacity?

12   A.   Corrections officer.

13   Q.   What were your duties as a corrections

14   officer?

15   A.   Man a control pod of, you know, housing

16   units, supervision of inmates, care, custody and

17   control, and then I did --

18   Q.   Was that at the jail?

19   A.   Yes, sir.

20   Q.   And prior to getting on with the Sheriff's

21   Office, did you go to any training classes?

22   A.   Prior to employment with the Sheriff's

23   Office?

24   Q.   Yes.

25   A.   For law enforcement, no, sir.

8

1      Q.   So you did the training contemporaneous with
2  the job?
3      A.   Yes.
4      Q.   Was there both classroom training and
5  on-the-job training?
6      A.   Yes.
7      Q.   Tell me about each one.
8      A.   Classroom training was new hire, basically
9  defensive tactics -- basic defensive tactics, basic
10 handcuffing, basic OC spray certification, basic
11 TASER certification, then there was the
12 administrative sexual harassment report writing, use
13 of force.
14         From there, I was in the field training
15 program, like 12 weeks, which was basically
16 on-the-job training, every aspect of the job from
17 logbook to writing reports, submitting
18 disciplinaries, feed up -- you know, feeding the
19 inmates, handing out supplies, you know,
20 walkthroughs of dorms.  Every aspect -- covered
21 every aspect of the job in corrections.
22     Q.   In corrections, okay.
23     A.   Yes.
24     Q.   Now, that's different from, like, detective
25 work; is that correct?

9

1      A.   In some aspects.

2      Q.   Tell me how it's different.

3      A.   You're not surrounded by 200 people that you

4  have to constantly supervise.  You know, the --

5  corrections is more of a maintaining the -- the care

6  and custody of the inmates, keeping accountability

7  of everybody, you know, tracking them as they check

8  out to go to different facilities, if they have to

9  go to court, if they have to go to medical, and

10  stuff like that.

11      There's not really a lot of investigation,

12  per se.  It's more observation than investigation.

13      Q.   So, at any time, did you go to any type of

14  training or on-the-job training for investigation?

15      A.   Well, the basic corrections certification is

16  a small part of the same aspect of the basic peace

17  officers, law enforcement, police training, and it's

18  covered in the academy to a certain extent, but it's

19  not in-depth and detailed like I received after

20  being assigned to investigations.  Just basic

21  preliminary investigations, you know,

22  patrol-level-type initial investigation training.

23      Q.   Were you subsequently assigned to

24  investigation --

25      A.   What --

MISSISSIPPI          LOUISIANA
228.222.4549    504.908.5417    GulfREPORTING
                                          SERVICE, LLC
                                LEADING THE SOUTH IN COURT REPORTING,
                                VIDEO, AND LITIGATION TECHNOLOGY

1    Q.  -- at the Sheriff's Office?

2    A.  No.

3    Q.  The whole time you were there, you were

4  always in corrections?

5    A.  Corrections and patrol.

6    Q.  And how long were you with the Sheriff's

7  Office?

8    A.  About seven-and-a-half years or so.

9    Q.  And when did you leave the Sheriff's Office?

10   A.  March of 2009.

11   Q.  And why did you leave?

12   A.  To come to Mandeville.

13   Q.  Was it a better job offer, better pay?

14   A.  Yeah.  Better pay and better opportunity.

15   Q.  Now, when you were with the Sheriff's

16  Office, were you ever reprimanded in any fashion?

17   A.  I was.

18   Q.  For what?

19   A.  Insubordination and failure to comply with

20  an internal investigation, I believe.  It was

21  insubordination.  I don't remember the specifics of

22  it.

23   Q.  What is "insubordination"?

24        What does that mean?

25   A.  Not doing as you're told.

MISSISSIPPI        LOUISIANA
228.222.4549      504.908.5417

*Gulf* REPORTING
SERVICE, LLC
LEADING THE SOUTH IN COURT REPORTING,
VIDEO, AND LITIGATION TECHNOLOGY

1    Q.   And did that have anything to do with you

2    leaving the Sheriff's Office?

3    A.   No.

4    Q.   You left the Sheriff's Office under good

5    circumstances?

6    A.   Yes.  Yep.

7    Q.   Now, when did you hire on with the

8    Mandeville Police?

9    A.   Immediately upon departing the Sheriff's

10   Office.

11   Q.   In March of '09?

12   A.   Yes.  In fact, if I remember correctly, I

13   left the Sheriff's Office on like a Tuesday and

14   started here on a Monday or a Wednesday.  I don't

15   think I had any separation in service.  Maybe I left

16   on a Friday and started on a Monday.

17   Q.   Had you already applied for the job?

18   A.   Yes; yes, I had.  I had tested for Civil

19   Service prior to.  Actually, I had tested for Civil

20   Service and tried to get hired with Mandeville in

21   2004 when I was assigned to corrections.

22       The Sheriff's office offered me --

23   Mandeville had called and offered me a position

24   while I was still assigned as supervisor in

25   corrections.  And, at the same time, I was offered a

MISSISSIPPI          LOUISIANA
228.222.4549       504.908.5417

*Gulf*REPORTING
SERVICE, LLC
LEADING THE SOUTH IN COURT REPORTING,
VIDEO, AND LITIGATION TECHNOLOGY

12

1    position in criminal patrol at the Sheriff's Office.

2    So since I was already at the Sheriff's Office, I

3    opted to stay at the Sheriff's Office and go to

4    patrol.

5         Q.   When you were on patrol, did you ever do any

6    rape investigations?

7         A.   Preliminary investigations.  At the

8    Sheriff's Office, being a much larger agency, they

9    had on-duty investigators, so our investigation and

10   response to major crimes, major felonies, always

11   consisted of the patrolman shows up, ascertains

12   basic facts, notifies the supervisor, and usually

13   the supervisor contacts the on-call detective, who

14   responds and takes over the investigation.

15        Q.   And you did several of those while you were

16   at the Sheriff's Office?

17        A.   A few that I can remember.  I wouldn't say

18   "several," but, you know, enough to have recalled at

19   least one or two.

20        Q.   Okay.  Well, tell me about the one or two

21   that you recall.

22        A.   One was at a hospital.  A woman had

23   presented at the hospital claiming that she had been

24   sexually assaulted in some manner.  I arrived at the

25   hospital, did a basic interview with her, called my

13

1  supervisor, the supervisor notified the on-call

2  detective, who responded and took over the

3  investigation.

4      Q.  When you were doing that at the Sheriff's

5  Office, is any type of discretion on your part

6  available to determine the credibility of the

7  victim?

8      A.  Not necessarily.  That always -- almost

9  always would fall on the responding detective

10 because the response is usually at the early,

11 initial stages of that investigation.

12     The responding patrolman usually doesn't get

13 into the meat and potatoes of the case in order to

14 make that determination.  Their goal was to

15 ascertain initial facts, relay it, and have somebody

16 come out and respond and handle that issue.

17     Q.  So, basically, you just kind of -- you're a

18 go-between between the victim and the -- whoever the

19 detective is?

20     A.  Yeah.  A surveyor of initial facts.  You

21 know, we don't really get into in-depth.

22     Q.  While you were at the Sheriff's Office, did

23 you make any arrests for rape?

24     A.  Not that I can recall.  Not based off of an

25 investigation that I personally conducted.  If I

14

1  would have, it would have been pursuant to a warrant

2  issued and maintained in the Sheriff's Office

3  system.  You know, like I make a stop on a traffic

4  stop and the person just so happens to have a valid

5  arrest warrant, either in NCIC or the system, for

6  rape.  That would be the only situation that that

7  would have occurred.

8     Q.  What I'm talking about is --

9     A.  Based on an investigation that I conducted

10  personally, no.

11     Q.  Okay.  That's what I was talking about.

12     A.  No.

13     Q.  When you got to Mandeville Police in '09,

14  you were hired on as a detective?

15     A.  No.  I was hired on as a patrolman.

16     Q.  What were your duties as a patrolman?

17     A.  You know, to conduct basic patrol activity,

18  respond to calls for service, conduct initial

19  investigation, and follow-up, you know, traffic

20  enforcement, crash investigation.

21     Q.  While you were a patrolman, did you ever

22  handle any rape cases?

23     A.  No.

24     Q.  In your training at any time, were you ever

25  trained with regard to the investigation of rape

15

1   cases?

2       A.   Subsequent to my assignment in

3   investigations, yes.

4       Q.   And that's only at Mandeville Police?

5       A.   Yes.

6       Q.   Never at the Sheriff's Office?

7       A.   No.

8       Q.   Well, tell me about that.

9       A.   About that training?

10      Q.   That training, yes.

11      A.   It was a -- I don't even remember the

12  specific amount of time.  It was a block in the

13  Public Agency Training Council new detective and

14  investigator course that I attended.

15      Q.   Where was that?

16      A.   Probably Gonzales.

17      Q.   And how long of a training session was it?

18      A.   I believe it was a week, 40 hours.

19      Q.   And do you know who --

20      A.   Public Agency Training Council.

21      Q.   Is that the name of the -- Public Agency?

22      A.   It's a company, yeah.  It's a company that

23  provides investigative law enforcement training.

24      Q.   And if you would, just briefly tell me the

25  gist of the training you got.

16

1      A.   The training is, you know, basically, how to

2  conduct basic criminal investigations from

3  conducting an initial evaluation of facts to

4  interviewing witnesses, victims, collection of

5  evidence, basic processing of the crime scene,

6  putting a report together, you know, determination

7  of facts and submission -- preparation of submission

8  of search warrants, arrest warrants, collection of

9  evidence.

10     Q.   Have you ever had any training with regard

11 to interrogation of victims and witnesses?

12     A.   I've been in interview and interrogation

13 training, yes.

14     Q.   Tell me about that.

15     A.   The Reid Institute.

16     Q.   Reid?

17     A.   Yes.   R-e-i-d Institute.   The Reid Technique

18 of Interviewing and Interrogation.

19     Q.   And where did you attend that?

20     A.   It was in New Orleans.

21     Q.   And how long of a curriculum was that?

22     A.   Four days, I believe.

23     Q.   And is part of that training to help you

24 determine if a witness -- a witness or a victim is

25 credible?

17

1    A.   It's not specifically a victim or witness,

2  but it's -- part of it is helping in determining the

3  credibility of the subject of the interviewing and

4  interrogation, whether -- it doesn't matter what

5  they are, what their role in the case is.   It's

6  strictly the subject of the interview.

7    Q.   So, in other words --

8    A.   The technique -- there's not a specific

9  technique taught for victims or witnesses as opposed

10 to suspects or perpetrators.   It's just the Reid

11 Technique for Interviewing and Interrogation,

12 period.

13   Q.   So it applies to anybody?

14   A.   Exactly.

15   Q.   And when did you attend the institute; do

16 you know?

17   A.   A couple of years ago.   I have all of my

18 certificates on file.   Honestly, I don't recall and

19 I don't want to give you a date.

20   Q.   Was it prior to the incident we're here

21 about that occurred on January 17, 2015?

22   A.   I think so, but I don't specifically recall.

23   Q.   But you have a record of that?

24   A.   Yes.

25   Q.   Can you produce that record and --

1      A.   I can go get it right now.

2      Q.   Okay.  Can you go get it?

3           (RECESS TAKEN.)

4      A.   April 8 through 10, 2014.

5  BY MR. ROBIN:

6      Q.   And could I see the document you're

7  referring to?

8      A.   Yes, (tendering document).

9           MR. ROBIN:

10           The witness handed me a document.  "John

11      E. Reid & Associates, Chicago, Illinois, hereby

12      certifies Jason Readeau attended and

13      successfully completed a course on the Reid

14      Technique Interviewing and Interrogation, dated

15      April 8 through 10, 2014.  Eighteen continuing

16      professional education credits awarded," and

17      it's signed by Michael Adamec.

18      A.   I don't -- your guess is as good as mine.

19  BY MR. ROBIN:

20      Q.   So this was a three-day course?  April 8, 9

21  and 10; is that --

22      A.   Yes.  Yeah, I guess it was three days,

23  and -- I know the fourth day was an advance that we

24  did not attend.

25      Q.   So you went through that interview and

19

1    interrogation conference to basically learn

2    techniques of interrogation and interviewing?

3        A.   Yes.

4        Q.   Had you had any other training like that,

5    either in a classroom or on the job, before?

6        A.   Yes.

7        Q.   Tell me about that.

8        A.   Every investigative-based course always

9    references interviewing and/or interrogation.  So

10   I'm sure there was a block in the PATC course that I

11   told you about earlier.  There were, you know,

12   several on-the-job, informal training sessions by

13   supervisors, field training officers, in reference

14   to interviewing.  You know, not specific techniques

15   with names, but just saying, "Hey, this is how I do

16   it," you know, "This is how I've seen" -- "how I've

17   been successful," you know.

18           There were -- I've taken a lot of detective

19   investigation-based courses, and it's always a

20   training block.  You know, it may only be a half

21   hour, it may be two or three hours, but...

22           The International Homicide Investigators

23   Association course that I took, there was a block

24   on -- you know, two- or three-hour block on

25   conducting interviews in that course as well.

20

1      Q.   And that was all prior to January 17, 2015?

2      A.   Yes.

3      Q.   Why is that important in law enforcement?

4           MR. DETWEILER:

5                Objection.   You can answer.

6   BY MR. ROBIN:

7      Q.   Knowing how to interview and interrogate,

8   why is that important; can you tell me?

9      A.   For determination of facts, determining

10  credibility of witnesses, victims, perpetrators.

11  That's part of the investigatory process.

12     Q.   And as of January 17, 2015, did you feel

13  like you were proficient in that regard?

14     A.   Yes.

15     Q.   Now, if somebody comes in and makes a rape

16  complaint to you, tell me what you do.   I mean, if

17  somebody comes in and says, "I've been raped," what

18  is, you know --

19     A.   Oh, the complaint is typically not going to

20  come to me.   It's going to go to the initial

21  responding officer or patrolman.

22     Q.   Okay.

23     A.   Who will either conduct a formal or informal

24  interview; being either an interview that is

25  audio/videotaped in an interview room or just a

21

1   person-to-person statement.   They may also collect a

2   handwritten statement by the victim or witness

3   reporting person.

4          From there, then the detective would be

5   notified and we would respond, review the facts and

6   complaint as received by the responding officer.

7   Typically, review the case file, review the

8   statement, talk to the officer, "Hey," you know,

9   "this is my understanding of what's in the report

10  and what the victim said.  Am I correct in my

11  understanding?"  "Yes."

12         From there, we would contact the victim,

13  bring the victim in for a follow-up interview,

14  re-address the initial statement, and then, also,

15  you know, go further in-depth, answer -- ask and

16  seek answers to in-depth questions as far as the

17  incident is concerned.

18     Q.  And, as in this case, if the victim, or the

19  alleged victim, walks into the Mandeville Police

20  Department and makes this rape allegation, would it

21  go straight to you --

22     A.  No.

23     Q.  -- if you're on duty?

24     A.  No, that's not -- procedurally, no.  An

25  initial officer is going to -- a patrolman is going

22

1    to speak to that person first inevitably, just

2    because of the way our situation is.

3         Most people don't even realize this building

4    is even here until we tell them.

5         Q.   I didn't know it was here until I got here.

6         A.   Exactly.

7         Q.   So the initial contact would be with a

8    patrolman?

9         A.   Yes.

10        Q.   And then the patrolman --

11        A.   Would notify his or her supervisor.  And

12   then, at that point, a determination would be made

13   to contact us.

14        Q.   So there are two levels before it gets to

15   you?

16        A.   Usually, at a minimum, yes.

17        Q.   Is there any discretion on the part of the

18   patrolman or the supervisor to determine the

19   credibility of the victim?

20        A.   There always is discretion.  That being

21   said, they usually notify us and just pass the

22   investigation off to us.

23        Q.   So they're going to defer to your judgment?

24        A.   Yes.

25        Q.   And that's most often the case?

1      A.   Yes.

2      Q.   So once it gets to you, tell me what action

3   is taken by you.

4      A.   I conduct interviews, determine the need for

5   the gathering of evidence and what would entail --

6   what that would entail, be it evidence collected

7   from the victim, evidence collected from a crime

8   scene, you know, evidence that may or may not be in

9   possession of the suspect.

10     Q.   So when you say you conduct interviews, does

11  that include the victim?

12     A.   Yes.

13     Q.   Does it include potential witnesses?

14     A.   Sometimes.

15     Q.   Does it include the accused?

16     A.   Sometimes.

17     Q.   When you say "sometimes," when is it -- when

18  do you --

19     A.   Purely a case-by-case basis.

20     Q.   Okay.

21     A.   I start every case by I make a list of the

22  people involved.  One of the other courses that

23  I've taken is I'm a Homeland Security law

24  enforcement intelligence analyst, which means I run

25  everything on everybody prior to.  I even -- that's

24

1  the first thing I do.

2       When I get a case, I start looking at all

3  the names involved, you know, make sure I know

4  exactly who I'm dealing with, you know, everything

5  that may or may not end up being relevant to the

6  case about them.  We have access to several

7  different databases in order to gather information

8  on people involved in an investigation, whether

9  they're witnesses, victims, suspects, whatever.

10       Typically, I do that first.  Then we will

11  conduct an interview of the victim.  Based on what

12  we get from the victim, then we will determine

13  whether there are witnesses that need to be

14  interviewed.  If so, we'll reach out to those

15  witnesses and attempt to conduct the interviews.

16     Q.  Do you do that before you seek an arrest

17  warrant?

18     A.  It's a case-by-case basis again.  I can't

19  show up and force you to come here and provide me a

20  statement.

21     Q.  I understand.

22     A.  And we're not in the habit of browbeating

23  people to participate in an investigation because we

24  don't want it to seem like we're trying to coerce

25  people into giving us what they think we want.

1       So, again, it's -- and I understand what

2   you're trying to get, but it is strictly a

3   case-by-case basis.

4       Q.  For instance, if you know where the alleged

5   incident took place and you know that the -- not

6   only the accused, but, like, there's a witness

7   there, do you attempt to interview the accused

8   and/or the witness prior to seeking a warrant?

9           MR. DETWEILER:

10              Objection to the form.

11  BY MR. ROBIN:

12      Q.  If they're readily available.

13      A.  It depends.  It's a case -- again, it's a

14  case-by-case basis.

15      Q.  Well, when is it appropriate and when is it

16  not appropriate?

17          MR. DETWEILER:

18              Objection.

19      A.  Again, the facts of the case as it's

20  determined by the investigator determines what

21  steps -- there is no clear-cut checklist of step 1,

22  step 2, step 3, step 4.  The detective assigned to

23  the case is given the latitude and the discretion to

24  conduct their investigation based upon their

25  determination of the path that the investigation

26

1   leads them to.

2        I mean, we don't have a supervisor that

3   says, "You will do this, this, this, this."  The

4   goal is to determine what we deem as a factual basis

5   leading up to probable cause through the

6   ascertaining of facts to progress through to a

7   conviction should the trail -- should the case go

8   that far.

9        How that is reached varies from case to

10  case.  It could be -- I've had where I've made an

11  arrest with no search warrants and only taken

12  statements.  I've had cases that I've done five,

13  six, seven search warrants, got thousands of pages

14  of records and it not gone anywhere.

15  BY MR. ROBIN:

16     Q.  Well, if you determine that the victim or

17  the alleged victim -- when you interview the

18  victim -- is not credible, do you seek an arrest

19  warrant?

20     A.  No.

21     Q.  What is the proper thing to do if you don't

22  think the victim is credible?

23     A.  If I don't think the victim is credible and

24  I have facts that show that the victim is not

25  credible, I deactivate the case, close it out, and

1  send it to my supervisor.

2      Q.   So you have that discretion --

3      A.   I have that --

4      Q.   -- to stop right there?

5      A.   I have that discretion.  Not only do I have

6  that discretion, I have done that.

7      Q.   Is that the correct thing to do?

8          MR. DETWEILER:

9              Objection.

10     A.   It depends on your definition of "correct."

11 According to our policy and procedures and the laws

12 and stuff that guides me in the execution of my

13 duties, yes, it's correct.

14 BY MR. ROBIN:

15     Q.   And then you turn it over to your

16 supervisor.  Who was it at this time?

17     A.   Lieutenant Whitehead.

18     Q.   Whitehead?

19     A.   Yes.

20     Q.   And would he engage in a similar process or

21 would he just defer to your judgment?

22     A.   You would have to ask him that question.

23     Q.   In your experience?

24     A.   In my experience, he has vastly more years

25 on the job doing this than I do.  If he thinks that

28

1   I should do something other than what I've done, he

2   will notify me.  I seek his advice on cases

3   regularly; this case, in particular.

4        And, you know, we sit down and -- you know,

5   this is not a solo show.  It's my name on the case

6   file, but, you know, typically, it's a team deal

7   here, you know.  I mean, we work these -- we bounce

8   ideas off each other constantly.

9        So I would -- I would say, undoubtedly, if

10  Lieutenant Whitehead felt, in any case, there were

11  steps that could have been taken or should have been

12  taken or should be taken through the course of the

13  investigation, he definitely would make that

14  suggestion and/or issue that order if required.

15       Q.   Was he consulted in this case?

16       A.   He was.  He was here.

17       Q.   That night?

18       A.   He worked that case with me.  We discussed

19  this case prior to the issuance of the warrants in

20  this case in that office right there.

21       Q.   Tell me about your discussions.

22       A.   We went over the interview, both the

23  interview that was conducted by the responding

24  patrol officer and my interview of the victim.  Then

25  we discussed the possibilities of, you know, whether

MISSISSIPPI        LOUISIANA
228.222.4549      504.908.5417

Gulf REPORTING
SERVICE, LLC
LEADING THE SOUTH IN COURT REPORTING,
VIDEO, AND LITIGATION TECHNOLOGY

29

1   we should obtain a search warrant, you know, conduct

2   interviews, and, you know, we determined that our

3   best course of action was to issue the search

4   warrant and the arrest warrant at the same time to

5   see -- not issue -- to seek a search warrant and

6   arrest warrant from the duty judge.

7       Q.   So the interview of the alleged victim in

8   this case, was it -- was this like videotaped?

9       A.   I believe it was.

10      Q.   And was it videoed with both the initial

11  patrolman?

12      A.   I believe so.

13      Q.   And then yours?

14      A.   I believe so.

15      Q.   Did Lieutenant Whitehead participate in any

16  kind of interview?

17      A.   He observed the interviews.

18      Q.   Contemporaneous or after?

19      A.   As they occurred.  We have live monitoring

20  on all of our interview rooms.

21      Q.   Are we being monitored right now?

22      A.   No.  No.  We couldn't all fit in our

23  interview room.  We would be very uncomfortable.

24      Q.   This is not an interview room?

25      A.   No.  This is our conference room.

MISSISSIPPI          LOUISIANA          *Gulf*REPORTING
228.222.4549        504.908.5417                SERVICE, LLC
                                          LEADING THE SOUTH IN COURT REPORTING,
                                          VIDEO, AND LITIGATION TECHNOLOGY

30

1      Q.   Now, why did you decide to include

2  Lieutenant Whitehead that night?

3      A.   That wasn't my decision.   Lieutenant

4  Whitehead is the supervisor, and we always respond

5  to callouts, two detective per callout as a matter

6  of practice because of officer safety reasons and

7  just general brain power.   You know, two minds are

8  better than one.

9           We typically respond in pairs at a minimum,

10  depending on the case.   And it was, in fact,

11  Lieutenant Whitehead that notified me to come out,

12  and him and I responded.

13      Q.   Were you on duty or did you actually come

14  in?

15      A.   No.   This was a callout.   We were off.

16      Q.   Do you know what time you got here?

17      A.   I have no idea.   I could check.   I clocked

18  in probably 6, 7:00 in the morning, I think, maybe.

19  I honestly don't remember.   I know it was early.

20      Q.   But the interview itself of the alleged

21  victim in this case, you conducted that?

22      A.   I conducted -- yeah, I conducted the

23  follow-up interview.

24      Q.   After the patrolman?

25      A.   Yes.

1    Q.  And Lieutenant Whitehead just observed?

2    A.  Yes.

3    Q.  Now, after you conducted this interview, did

4 you determine that the victim was credible?

5    A.  Yes.

6    Q.  Did Lieutenant Whitehead concur in that

7 determination?

8    A.  He did.

9    Q.  Tell me what you recall the victim telling

10 you.

11    A.  That she had been asleep in the room with

12 Mr. Liberto, had fallen asleep, and, at some point,

13 awoken to him on top of her, engaged in sexual

14 intercourse.

15        She then explained that while she was asleep

16 or sort of asleep, whatever state you want to

17 describe that, felt the sensation of receiving oral

18 sex, which had caused her to wake up at some point.

19    Q.  Did she tell you she had been living --

20    A.  Yes --

21    Q.  -- with --

22    A.  She did.

23    Q.  -- Mr. Liberto?

24    A.  She did.

25    Q.  Did she tell you that she had been in an

MISSISSIPPI    LOUISIANA    *Gulf*REPORTING
228.222.4549  504.908.5417       SERVICE, LLC
LEADING THE SOUTH IN COURT REPORTING,
VIDEO, AND LITIGATION TECHNOLOGY

32

1   intimate relationship with Mr. Liberto?

2       A.   She did.   She did.

3       Q.   And she told you that she was sleeping in

4   the same bedroom with Mr. Liberto?

5       A.   She did.

6       Q.   And didn't she tell you that when she went

7   to bed, she was fully dressed?

8       A.   She did.

9       Q.   And she told you she awoke to a sensation of

10  engaging in a sexual act?

11      A.   Yes.

12      Q.   Did you ask her how she got undressed?

13      A.   I did.   I believe so.

14      Q.   What did she say?

15      A.   She said she didn't know.

16      Q.   Did she tell you, was she under the

17  influence of any type of drugs or alcohol that would

18  have rendered her incapable of consent?

19      A.   I don't recall her response to that.   I

20  don't believe so though.

21      Q.   You don't believe she was under the

22  influence?

23      A.   I don't remember her mentioning anything.

24      Q.   Is that something you generally ask?

25      A.   I would.

MISSISSIPPI          LOUISIANA
228.222.4549       504.908.5417

*Gulf* REPORTING
SERVICE, LLC
LEADING THE SOUTH IN COURT REPORTING,
VIDEO, AND LITIGATION TECHNOLOGY

33

1      Q.   It's important, isn't it?

2      A.   It would be.

3      Q.   Did she tell you anything about her being

4  upset because Mr. Liberto was unwilling to make any

5  type of long-term commitment with her?

6      A.   She did.

7      Q.   Did that give you any pause as to her

8  motivation?

9      A.   It was worth noting in my report.

10     Q.   It is in your report.

11     A.   I know it is.

12     Q.   And is this what's been attached as --

13          MR. ROBIN:

14              Maybe you can help me.  The police

15     report, what exhibit is it on your motion?

16          MR. DETWEILER:

17              Let me see.

18          MR. ROBIN:

19              I just don't see any exhibit numbers.

20          MR. DETWEILER:

21              I can tell you -- wait.  Hold on.  It's

22     probably Exhibit B because I know Jason's

23     affidavit was Exhibit A, so I probably followed

24     chronologically.

25  BY MR. ROBIN:

34

1      Q.  Detective Readeau, I'm going to show you

2  your attorney's exhibit.  This is the Mandeville

3  Police Department.  Is this the report generated by

4  Mandeville Police Department regarding this

5  incident?

6      A.  It is.

7      Q.  And this is 1 of 13 pages, so it's about a

8  13-page long report?

9      A.  Yes.

10     Q.  You participated in the formulation of this

11 report?

12     A.  I did.

13     Q.  And, specifically, this includes the Officer

14 Becky White -- her report?

15     A.  Yes.

16     Q.  Who is Becky White?

17     A.  She was the patrol officer that initially

18 responded to the call.

19     Q.  And then there's a document, supplemental

20 narrative.  Is this what you prepared?

21     A.  It is.  It's one of -- there are -- my

22 recollection is there's a few supplemental

23 narratives, and one or two of them are authored by

24 myself.

25     Q.  Why don't you look at them for me and tell

1    me which ones and just refer to it as page number

2    like this is page 4 of 15, Mandeville Police

3    Department supplemental narrative.  Tell me which

4    ones you prepared.

5        A.  Page 4, 5, and 6, page 7, and page 9, it

6    appears.

7        Q.  Okay.

8        A.  Yes.

9        Q.  And all of that is -- all the typing here is

10   yours?

11       A.  Yes.

12       Q.  All right.  Well, tell me what -- and you

13   can refer, unless you have an independent

14   recollection.  Do you remember what the victim told

15   you?

16       A.  Specifically, verbatim, no.

17       Q.  Do you want to look at your report?

18       A.  Sure.

19       Q.  That will help you refresh your memory.

20       A.  Okay, (examines document.)

21        (MS. KNIGHT EXITS ROOM.)

22   BY MR. ROBIN:

23       Q.  My question was, what did the alleged victim

24   tell you had occurred?

25       A.  That she had fallen asleep.  Can I --

MISSISSIPPI    LOUISIANA
228.222.4549   504.908.5417

*Gulf* REPORTING
SERVICE, LLC
LEADING THE SOUTH IN COURT REPORTING,
VIDEO, AND LITIGATION TECHNOLOGY

36

```
 1            MR. DETWEILER:

 2                 It's the same report.

 3            MR. ROBIN:

 4                 Sure.

 5       A.  Yeah.  Can I refer to it?

 6  BY MR. ROBIN:

 7       Q.  Sure.

 8       A.  She -- can I read it?

 9       Q.  Sure?

10       A.  (Reading.)  She explained she had been

11  living with Liberto in his sister's home at 645

12  Lafayette Street in Mandeville after becoming

13  homeless in mid-December, 2014.  The two shared a

14  bedroom --

15            MR. DETWEILER:

16                 Slow down a little bit so she can get

17       it.

18            THE WITNESS:

19                 Okay.  I'm sorry.

20       A.  The two shared a bedroom with bathroom in

21  the residence.  She did not pay rent, did not have a

22  lease or rental agreement, but assisted with

23  household chores in exchange for a place to stay.

24            She further explained she and Liberto had

25  been involved in an on-and-off relationship
```

MISSISSIPPI        LOUISIANA
228.222.4549      504.908.5417


Gulf REPORTING
SERVICE, LLC
LEADING THE SOUTH IN COURT REPORTING,
VIDEO, AND LITIGATION TECHNOLOGY

37

1   beginning in late October, 2014, wherein they were

2   intimate.  The victim continued to explain the two

3   had broken up as of January 2nd, 2015, but were

4   still living together as she attempted to secure new

5   living arrangements.

6         The victim advised she and Liberto shared a

7   bedroom and slept in separate twin trundle beds in

8   that room but had not been intimate or had any

9   sexual contact since January 2nd, 2015.

10        The evening of January 16, 2015, the victim

11   feel asleep in her bed at approximately 2340 hours,

12   after returning home from work at approximately

13   2315 hours.  Sometime prior to 0130 hours, the

14   victim was awoken from her sleep with the feeling of

15   being vaginally penetrated.  The victim explained

16   prior to being clearly awake and aware, she thought

17   she was having a sexual dream as she felt the

18   sensation of receiving oral sex.

19        Upon waking up and becoming aware of her

20   surroundings and situation, she found Luke on top of

21   her with his penis inside her vagina.  She further

22   noticed she was unclothed, although she had been

23   wearing a thermal shirt, running pants, and

24   underwear when she went to bed.

25   BY MR. ROBIN:

MISSISSIPPI    LOUISIANA
228.222.4549   504.908.5417


GulfREPORTING
SERVICE, LLC
LEADING THE SOUTH IN COURT REPORTING,
VIDEO, AND LITIGATION TECHNOLOGY

38

1      Q.   Let me just stop you for a second.   I

2  questioned about this earlier, but did you ask her

3  anything about the fact that, you know, she was

4  dressed when she went to bed but that she became

5  undressed?   Did you delve into that in any more

6  detail?

7      A.   Without reviewing the video of the

8  interview, I don't recall specifically.

9      Q.   Well, do you have -- is the video here in

10  the office?

11      A.   No.   We would have to contact the IT

12  administrator and have him dig it out of the

13  archives.   That machine has since been replaced.

14  It's somewhere, but it's probably submitted as

15  evidence originally in the criminal case.

16          MR. ROBIN:

17              Yeah, well, I call for production of the

18      video.

19          MR. DETWEILER:

20              We'll see if it exists.   Y'all have

21      filed nothing before this and we're past

22      discovery, so we'll see.

23          MR. ROBIN:

24              All right.

25  BY MR. ROBIN:

39

1     Q.   Now, did you think it was kind of unusual

2  that a person could be undressed while they're

3  sleeping and not under the influence of any type of

4  drug or alcohol and not notice they're being

5  undressed?

6          MR. DETWEILER:

7              Objection.

8              You can answer subject to the objection.

9     A.   It was obvious, you know -- it was of note

10 to the point where I included it in my report.

11 BY MR. ROBIN:

12    Q.   It's something that would -- in my mind, I

13 mean, if somebody tells me that they noticed sexual

14 activity, if they're awake enough to notice that,

15 then they would be awake enough to know that they're

16 being undressed.

17    A.   I'm not a sleep expert.

18    Q.   I know, but you're an interrogator.  You're

19 trained in interrogation?

20    A.   Trained in interview and interrogation.

21    Q.   Yes.  So she didn't say anything about when

22 she was being stripped of her clothing?

23          She didn't say anything about that waking

24 her up?

25    A.   Again, I don't recall, but if it's not in my

1   report, then I would say that she did not.

2       Q.   And didn't she tell -- she told you that

3   when she told Luke she didn't want to have

4   intercourse, that he stopped?

5       A.   Yes.

6       Q.   And he did stop?

7       A.   He did.

8       Q.   And you note in your report that, during the

9   course, she seemed to be upset and emotional and on

10  the verge of tears; is that correct?

11      A.   Yes.

12      Q.   And she told you that she loved Liberto but

13  that he was seeking relationships with other women?

14      A.   Yes.

15      Q.   Did that give you any reason to think that

16  her motivations were not altogether sincere?

17      A.   Again, it was of note that it was included

18  in the case file.  My job is not to determine facts

19  relative to -- you know, I'm not a trier of facts.

20  I collect information and prepare it.  And once I

21  feel that the level of probable cause has been

22  achieved, then as a matter of practice in

23  investigations, we prepare and submit arrest

24  warrants and leave that up to the judge to determine

25  whether the level of probable cause is achieved.

1    Q.   All right.   But it's correct that before you

2  seek a warrant -- I mean, you testified earlier that

3  if there's lack of credibility on the part of the

4  person giving you the statement, you can elect not

5  to seek the warrant.

6    A.   And that was not the case in --

7    Q.   I know, but is that correct?

8    A.   That is correct.

9    Q.   I know you said it.   You can explain your

10 answer, but, initially, if you determine the person

11 is not credible, you know, if Detective Readeau is

12 sitting there and saying, "I don't find this person

13 to be credible," you can stop it right there, can't

14 you?

15   A.   I can.

16   Q.   Is that the policy of the Mandeville Police

17 Department?

18        MR. DETWEILER:

19            Objection.

20   A.   It is allowed by our policy for an officer

21 to exercise their discretion when conducting an

22 investigation.

23 BY MR. ROBIN:

24   Q.   And if you make that determination, and --

25 that the victim -- the story you're hearing is not

42

1    credible, would it be an abuse of your discretion to

2    go seek a warrant anyway?

3           MR. DETWEILER:

4                Objection.

5        A.  I would say, yes, it would be.

6    BY MR. ROBIN:

7        Q.  Now, here, you determined that the victim

8    was believable?

9        A.  She was credible enough to prepare and

10   submit a warrant.

11       Q.  Did you ever -- prior to seeking the

12   warrant, did you ever consider going to interview

13   Mr. Liberto?

14       A.  We did.

15       Q.  You did?

16       A.  Yes.

17       Q.  And did you?

18       A.  No.

19       Q.  Why not?

20       A.  Because we determined that an interview of

21   Mr. Liberto would not change the fact that this case

22   would merely be -- this case would equate to two

23   individuals who had a different story of the same

24   incident for a he said/she said incident; and that

25   not judging anyone on their prior histories and

43

1   taking everything at face value, our options were

2   grand jury or arrest warrant.

3          And as a matter of practice on cases prior

4   to this, the District Attorney's office had always

5   referred us to prepare and request an arrest warrant

6   in lieu of submitting something to a grand jury for

7   consideration.

8          Q.   But it was within your discretion,

9   notwithstanding what you just told me, you could

10  have gone and attempted to --

11         A.   We could.

12         Q.   -- interview Mr. Liberto and just see what

13  his side of the story is?

14         A.   We could have.

15         Q.   You've done that before in cases like this?

16         A.   From time to time, in cases in general,

17  sometimes we will attempt to interview the suspect.

18  Sometimes we'll just obtain an arrest warrant and

19  move forward.

20         Q.   Well, if you determine that the alleged

21  victim is not credible, wouldn't it be better to

22  interview the accused before issuing an arrest -- or

23  before you issue a warrant for their arrest?

24         MR. DETWEILER:

25              Objection.

MISSISSIPPI        LOUISIANA
228.222.4549       504.908.5417

Gulf REPORTING
SERVICE, LLC
LEADING THE SOUTH IN COURT REPORTING,
VIDEO, AND LITIGATION TECHNOLOGY

44

BY MR. ROBIN:

    Q.  Wouldn't it be better?

    A.  Yes.

    Q.  Because anybody can accuse anybody of rape; is that correct?

    A.  That is correct.

    Q.  And it may not be rape; is that correct?

    A.  That is correct.

    Q.  Now, she also told you that Mr. Liberto's sister was living with them as well; is that correct?

    A.  Yes.

    Q.  Gina Favret, I think?

    A.  Gina is the only name I remember.

    Q.  Did you ever consider going to interview Ms. Favret prior to seeking the arrest warrant?

    A.  No.

    Q.  Why not?

    A.  Because we didn't have any information that she was actually in the room when the sexual contact occurred, so we determined it would not have any relevance to the consent of the sexual encounter that was in question.

    Q.  Well, if -- but you knew Ms. Favret was in the house, Gina?

MISSISSIPPI   LOUISIANA
228.222.4549   504.908.5417

*Gulf* REPORTING
SERVICE, LLC
LEADING THE SOUTH IN COURT REPORTING,
VIDEO, AND LITIGATION TECHNOLOGY

45

1     A.   Yeah, but she wasn't in the room when the

2     sexual contact occurred.

3     Q.   Right.

4     A.   So the fact that was under contention was

5     not whether or not sex had occurred.  We knew that

6     it had occurred.  The fact that was in contention

7     was the consent, whether it was consensual or not.

8          So her presence in another room of the house

9     had no bearing or relevance to whether or not that

10    act was consensual when Mr. Liberto and the victim

11    were the only two persons in the room at the time

12    the act occurred.

13    Q.   Well, certainly Mr. Liberto's take on the

14    story, would have a bearing on whether or not it was

15    consensual; is that correct?

16    A.   I don't know.  I haven't talked to him about

17    his opinion.

18    Q.   Well, you didn't attempt to talk to him that

19    night, though?

20    A.   No.  That morning, no, I didn't.  In fact,

21    upon initial contact, the first thing that he said

22    was that he wasn't talking to anybody without his

23    lawyer.  So, regardless of whether I wanted to or

24    not, he had immediately invoked his right to counsel

25    upon our contact.

46

1      Q.   Tell me what you recall him saying.  Now,

2  this is after the warrant has been issued --

3      A.   Yeah.

4      Q.   -- and you're over there to arrest him?

5      A.   Well, we show up and -- with the search

6  warrant and arrest warrant, and his immediate

7  response was to tell his sister to contact his

8  attorney.  And her response to him in our presence

9  was, "Okay.  I'm going to handle it.  Don't say

10  anything."

11          And he said, "I'm not talking to y'all about

12  anything," or something to -- I don't know

13  specifically what he said, but he invoked his rights

14  to the point where we knew that he wasn't going to

15  cooperate.  He wasn't going to provide a statement

16  at that point.

17      Q.   You went to his residence and you presented

18  him with an arrest and search warrant?

19      A.   We presented the search warrant and advised

20  him that we had an arrest warrant for him as well,

21  yes.

22      Q.   Do you recall him telling you that if he

23  gave a statement, would it make a difference?

24      A.   I don't recall that.

25      Q.   Do you recall telling him that regardless of

47

1    what statement he made, it would not make any

2    difference?

3         A.   If I was holding an arrest warrant in hand,

4    then that would be a logical answer to that

5    question.   Because, at that point, an arrest warrant

6    has been issued, so the arrest is going to be

7    carried out upon contact, yes.

8         Q.   And do you recall him invoking his right to

9    counsel only after you told him that it would not

10   make any difference what his statement was?

11        A.   I don't recall the pattern of events.

12        Q.   So Mr. Liberto was arrested?

13        A.   Yes.

14        Q.   And he was charged with simple rape?

15        A.   He was arrested for simple rape.

16        Q.   Tell me, what is the crime of simple rape.

17   How is that defined?

18        A.   It is the sexual intercourse without

19   consent, not by use of force.   It's now third degree

20   rape.   But when the victim is incapable --

21        Q.   Your counsel just handed you a piece of

22   paper --

23        A.   Yeah, he did.

24        Q.   -- for the record.

25        A.   Yeah, he did.

48

1     Q.   Before you read that to me, what was your

2   understanding of the crime of simple rape on the

3   night of this incident?

4     A.   My understanding of the crime of simple rape

5   was that it was a rape wherein there's no force but

6   the victim is incapable of consenting due to

7   intoxication or other means.

8     Q.   And so when you sought the arrest warrant,

9   is that the warrant you presented to the judge --

10    A.   It is.

11    Q.   -- for simple rape?

12    A.   Yes.

13    Q.   And that was based on what you've already

14  told me, the contents of your report?

15    A.   Yes.

16    Q.   Did you ever consider obtaining an arrest

17  warrant for sexual battery?

18    A.   We reviewed the Louisiana Revised Statutes

19  and determined that simple rape best suited the

20  facts as we had determined them at that point.

21    Q.   So you didn't consider sexual battery?

22    A.   We considered -- we reviewed all the

23  statutes.  Sexual battery was one of them.  But,

24  ultimately, we opted to go with simple rape.

25    Q.   Now, when you were -- when you got to the

MISSISSIPPI        LOUISIANA
228.222.4549       504.908.5417

Gulf REPORTING
SERVICE, LLC
LEADING THE SOUTH IN COURT REPORTING,
VIDEO, AND LITIGATION TECHNOLOGY

49

1   house and you said you spoke with the -- the sister

2   was present?  Gina was present?

3       A.  Yes.

4       Q.  Did you attempt to interview her at that

5   time?

6       A.  No.

7       Q.  Did you ever attempt to interview her?

8       A.  No.

9       Q.  And she wasn't charged with anything, was

10  she?

11      A.  No.

12      Q.  Is it appropriate to interview a witness in

13  circumstances like this?

14          MR. DETWEILER:

15              Objection.

16      A.  If they're an actual witness.

17  BY MR. ROBIN:

18      Q.  You're talking about an eyewitness?

19      A.  Yes.

20      Q.  That's the only time it's appropriate?

21      A.  If they're a witness to the facts that are

22  in contention then, yes, they will be interviewed.

23      Q.  But considering that they're in the same

24  household where the alleged incident was supposed to

25  have occurred --

50

1     A.   She wasn't an eyewitness to the offense;

2  therefore, I didn't deem it necessary to interview

3  her.

4     Q.   I mean, for instance --

5          MR. DETWEILER:

6               Objection.  You're becoming

7      argumentative.

8          MR. ROBIN:

9               No, I'm not.

10          MR. DETWEILER:

11               Yes, you are.

12  BY MR. ROBIN:

13     Q.   Aren't circumstances which occur after the

14  fact germane as to whether or not a crime has been

15  committed?

16     A.   How so?  I don't understand your question.

17     Q.   If people are under the same roof in which

18  this felony has been alleged to happen, you don't

19  think it's appropriate to interview other people

20  that are in the house as to what they know about it?

21     A.   Not unless it's thought that they will offer

22  anything substantive to the facts of the case, the

23  investigation.

24          Again, the only issue that was in question

25  is whether the sexual contact was consensual or not.

MISSISSIPPI          LOUISIANA
228.222.4549      504.908.5417

Gulf REPORTING
                    SERVICE, LLC
LEADING THE SOUTH IN COURT REPORTING,
VIDEO, AND LITIGATION TECHNOLOGY

1          Q.   Okay.

2          A.   So based on that, we deemed that it wasn't

3    necessary to interview Mr. Liberto's sister because

4    we knew she hadn't been in the room at the time

5    consent may or may not have been given or withdrawn

6    or whatever the case may have been.

7          Q.   When -- I think when the interview was

8    taking -- the initial interview was taking place,

9    did Ms. -- the victim -- I'll try to keep it at

10   that.

11              Did she tell you what time it took place?

12         A.   She gave a window.

13         Q.   And does your report indicate that to you?

14         A.   It would have been between, you know, 23 --

15   she said that she fell asleep approximately 2340 and

16   that she woke up around 0130, so she gave that

17   window of time.

18         Q.   So 23 is --

19         A.   11.

20         Q.   -- 11?

21         A.   11 p.m.

22         Q.   For us laymen?

23         A.   Yes.

24         Q.   And 0130 was?

25         A.   1:30 in the morning.

MISSISSIPPI        LOUISIANA
228.222.4549    504.908.5417

*Gulf*REPORTING
SERVICE, LLC
LEADING THE SOUTH IN COURT REPORTING,
VIDEO, AND LITIGATION TECHNOLOGY

52

1      Q.   In the morning?

2      A.   That morning.

3      Q.   And what time did she arrive at the

4   Mandeville police station?

5      A.   According to this report, it says that it

6   was reported at 0245.

7      Q.   And where did this incident take place?

8      A.   On -- what's the address?  I know it's in

9   here somewhere.

10          645 Lafayette Street, Mandeville.

11     Q.   And how far away is 645 Lafayette Street

12   from here?

13     A.   From here or from where she filed the

14   report?

15     Q.   Well, where --

16     A.   It's a two- to five-minute drive, depending

17   on traffic.  At 1 in the morning, two minutes.

18     Q.   Now, did the victim tell you what she was

19   doing for that hour and 15 minutes between the

20   time --

21     A.   She said she had contacted a friend to come

22   and pick her up and was waiting on a ride.

23     Q.   So she stayed in the house?

24     A.   That's my assumption.

25     Q.   And she stayed there even though she was

MISSISSIPPI        LOUISIANA
228.222.4549      504.908.5417

Gulf REPORTING
SERVICE, LLC
LEADING THE SOUTH IN COURT REPORTING,
VIDEO, AND LITIGATION TECHNOLOGY

53

1    allegedly raped there?

2         A.   That's what I was told.

3         Q.   Do you find that to be credible?

4         A.   I find it to be what she -- I didn't deem

5    her to not be credible.

6         Q.   Okay.  So if I'm understanding your

7    testimony, everything that's contained in your

8    report that this lady told you, you deemed to be

9    credible?

10        A.   I determined to be credible, yes.

11        Q.   And is it fair to say that had you

12   determined it not to be credible, you would not have

13   sought an arrest warrant for Mr. Liberto?

14        A.   Yes.

15             Can I expound on that briefly?

16        Q.   Absolutely, sir.

17        A.   As a matter of practice, not just at the

18   Mandeville Police Department, but based on my

19   experience with the Sheriff's Office as well, law

20   enforcement officers do not make a habit of

21   interrogating and questioning the credibility of

22   witnesses and/or victims of a crime until such time

23   that they have tangible facts to do so.

24             In extreme, contradictory statements, as if

25   she would have told the patrolman one thing and told

54

1   me something else, changed the timeline, you know,

2   recanted in any way, then that, to me, based on my

3   training and experience, are flags for a lack of

4   credibility.

5        None of those issues were detected through

6   my contact with the victim, through my interviews

7   with her, and I was not informed that -- by Officer

8   White that she detected any inconsistencies that

9   would have tipped her off as to a lack of

10   credibility on the part of the victim.

11      Q.   But there are other indicators of

12   credibility that you can determine?

13      A.   Well, there are, you know, but it --

14      Q.   I mean, you're trained to do that?

15      A.   Yes.   But at the same time, there is no

16   checklist for who can -- there is no clear written

17   rule of who can be a victim of a crime.

18        You know, just like we don't prejudge

19   suspects until we ascertain the facts of the case,

20   we don't prejudge victims or witnesses either.   Just

21   because -- you know, if somebody has a criminal

22   record or whatever, if they're homeless or a drug

23   addict, that doesn't mean they can't still be a

24   victim of a crime, you know.

25        So as a matter of practice, we don't

55

1  interrogate every victim or witness that we're

2  presented.  You know, we conduct an interview, and

3  if that interview produces contradictory facts and

4  statements to the evidence that we obtained that

5  indicates that that victim or witness is lying,

6  then, of course, we do pursue that.

7      Q.  Okay.  Well, aside from contradictory

8  statements, things that you just explained, when

9  you're conducting the interview process, there are

10  other indicators -- there can be other indicators

11  that might cast out on the person's credibility?

12      A.  Yes.

13      Q.  And you're trained to determine that?

14      A.  Yes.  I mean, I'm not a human polygraph,

15  but, yeah, within reason.

16      Q.  But you are trained, I mean?

17      A.  Yes.

18      Q.  And it's your testimony that you found the

19  victim here to be credible that night?

20      A.  That is my testimony.

21      Q.  Did you ever conduct any other interviews

22  with the victim aside from this initial one?

23      A.  I believe at one point I did contact her on

24  the phone to determine who her cell carrier was.

25      Q.  Okay.



56

1      A.  But there were no other formal -- no formal

2   follow-up interviews.

3      Q.  So that was just for the -- this has to do

4   with those text messages, right?

5      A.  Yes.

6      Q.  But there was no further conducting

7   interview about the incident?

8      A.  No.

9      Q.  This is the only one?

10      A.  That's it.

11      Q.  And that's contained in your report?

12      A.  Yes.

13      Q.  At any time did you ever determine that the

14   victim was not credible?

15      A.  No.

16      Q.  Did you ever tell anyone that you didn't

17   find the victim to be credible?

18      A.  No.

19      Q.  As we sit here today, do you find the victim

20   to have been credible?

21      A.  I believe that my determination made at the

22   time was an accurate determination.  It's my

23   understanding of the criminal procedure, was not

24   that any -- whoever screened the case determined

25   that the case was -- that the victim was not

MISSISSIPPI          LOUISIANA
228.222.4549      504.908.5417

GulfREPORTING
SERVICE, LLC
LEADING THE SOUTH IN COURT REPORTING,
VIDEO, AND LITIGATION TECHNOLOGY

1    credible.

2          It's my understanding that the prosecution

3    didn't go forward because the victim just refused to

4    follow through with the prosecution.  That's my

5    understanding.

6          Q.  And how did you obtain that understanding?

7          A.  I was contacted by an attorney with the

8    Louisiana Attorney General's office in reference to

9    the case.

10         Q.  Do you remember who that was?

11         A.  I don't.  It was a very -- I got a phone

12   call, "Hey, 22nd recused themself.  We're handling

13   it.  I'll be in touch."

14         And a couple of weeks, maybe a month later,

15   I got a call, "Hey, look.  The victim doesn't want

16   to follow through with it anymore, so we're just

17   going to nolle process it."

18         And that was the end of my involvement of

19   the prosecution.  I didn't ask questions, didn't ask

20   for details.

21         Q.  So you didn't engage in any discussion with

22   them why you felt the case should go forward?

23         A.  No.

24         Q.  Why not?

25         A.  I'm not the attorney.  That's not my job.

58

1    Q.  But you were the arresting officer?

2    A.  I was the arresting officer.

3    Q.  You took the --

4    A.  I have no stake in -- you know, what I tell

5    people is I don't get a free toaster at the end of

6    the month based on successful arrests, prosecutions,

7    or anything.

8        I conduct an investigation to determine

9    facts; prepare those facts; request and execute, if

10   obtained, warrants; and present the case.

11       And then, from there, there are people

12   that -- you know, who get paid to evaluate the

13   merits of the case for prosecution.  And when they

14   call me and need me, I go and I testify, and that's

15   it.

16   Q.  So you didn't tell whoever this gentleman or

17   lady from the Attorney General's office, you didn't

18   say, "Well," you know, "I really think this lady was

19   credible and I think that the prosecution should go

20   forward"?

21       You didn't say anything like that?

22   A.  I didn't say either way.  I didn't say she

23   was credible.  I didn't say she wasn't.  Just,

24   "Okay.  Thanks for letting me know."

25   Q.  Okay.  Now, did you ever discuss this case

1  with anyone else besides what you just told me with

2  the Attorney General's office?

3           MR. DETWEILER:

4              You mean prosecutors?

5           MR. ROBIN:

6              Prosecutors or anybody.

7    A.   We did a follow-up interview at the request

8  of Mr. Liberto and Mr. Lindner at the jail a couple

9  of days after the arrest.

10  BY MR. ROBIN:

11    Q.   Tell me about that.

12    A.   Mr. Liberto just -- you know, the facts of

13  the case, again, were pretty much the same with the

14  exception of the consent, and if you'd allow me to

15  review --

16    Q.   Absolutely.

17    A.   -- I'm sure I documented it.  I just don't

18  remember the specifics of...  (Reading.)

19       (OFF-RECORD DISCUSSION.)

20  BY MR. ROBIN:

21    Q.   Are you on page 5?

22    A.   Yeah.  Last paragraph.

23    Q.   Okay.  Why don't you tell me about --

24    A.   Okay.  Again, do you mind if I read it,

25  because I --

MISSISSIPPI     LOUISIANA
228.222.4549   504.908.5417

GulfREPORTING
SERVICE, LLC
LEADING THE SOUTH IN COURT REPORTING,
VIDEO, AND LITIGATION TECHNOLOGY

60

1      Q.   Not at all.

2      A.   (Reading.)   On the afternoon of

3   January 26th, 2015, Detective Readeau met with

4   Mr. Liberto and his appointed public defender, John

5   Lindner, at the St. Tammany Parish Jail.

6   Mr. Liberto was again fully advised of his Miranda

7   rights and signed same.   He then provided a verbal

8   statement as to the incident that occurred on the

9   night of January 16th, the early morning of

10   January 17th, 2015.   Mr. Liberto provided that he

11   had gone to bed at approximately 2300 hours on the

12   night in question, laying in the top bed of the room

13   shared by he and the victim.

14        A short time after he entered the room,

15   victim entered and proceeded to change in front of

16   him, which he noted was not unusual.   Mr. Liberto

17   stated then he got into bed -- oh, I'm sorry.

18   Mr. Liberto stated the victim then got into bed with

19   him and the two began to cuddle and dose off.   At

20   some point, the two began to engage in mutual sexual

21   foreplay with Liberto performing oral sex on the

22   victim.   The two began having sexual intercourse,

23   during which time Liberto stated he inserted his

24   penis into the victim's vagina.

25        During intercourse, Mr. Liberto stopped and

61

1    removed himself from the victim, stating they should

2    not be having sex.  The victim agreed, and

3    Mr. Liberto stated he observed, at that point -- at

4    that point to become emotional.  He went to the

5    bathroom, then left the bedroom and went to the

6    kitchen to make a sandwich.

7          Mr. Liberto stated that the victim was awake

8    and conscious during the encounter.  And to the best

9    of his knowledge, he had not consumed -- and to the

10   best of his knowledge, had not consumed any alcohol

11   or taken any drugs on the night of the incident.

12       Q.   Let me stop you.

13       A.   Yes.

14       Q.   What you're referring to there is that the

15   victim had not consumed any alcohol --

16       A.   Yes.

17       Q.   -- or taken any drugs --

18       A.   Yes.

19       Q.   -- on the night of the incident?

20       A.   Yes.

21       Q.   Is that also what the victim had told you

22   the night of the incident; that she had not consumed

23   any alcohol?

24       A.   Again, I don't recall.  Let's see.

25          (Reading.)  He stated he offered to leave

62

1   and stay at his mother's immediately after the

2   incident after he and the victim began to argue via

3   the text message.

4           Victim exited the bedroom with her things

5   while he was in the living room.  Victim announced

6   she was leaving and left with an unknown friend.

7           Q.  So you were in an interview room with

8   Mr. Liberto and his attorney --

9           A.  And Mr. Lindner, yes, sir.

10          Q.  -- when this took place?

11          A.  Yes.

12          Q.  Did you find Mr. Liberto to be credible?

13          A.  I found him to be just as credible as anyone

14  else that would be providing a statement.

15          Q.  And that's based on your training?

16          A.  Yes.  This -- this interview was conducted

17  at the request of Mr. Lindner.  Mr. Lindner

18  contacted me and requested that Mr. Liberto be

19  offered the opportunity to provide a statement for

20  the case file, and I obliged that request.

21          Q.  And, again, you found his statement to be

22  credible?

23          A.  As credible as the victim's.

24          Again, like I previously explained, the

25  issue with this case was never whether a sexual

1    encounter occurred.  It was all whether it was

2    consensual or not.

3         Q.  Now, earlier you talked about the text

4    messages that ensued after this alleged incident

5    occurred.

6         A.  Yes.

7         Q.  Did you actually see those messages?

8         A.  I saw the messages as presented on one of

9    the phones.  I believe it was the victim's phone.

10             As a matter of practice, I know that,

11   especially with certain platforms, text messages can

12   be selectively deleted, which can manipulate the

13   flow of a conversation via text, so I didn't delve

14   into it and do an in-depth examination.  We ended up

15   doing search warrants to try and recover the text

16   messages specifically from the carrier.

17             (OFF-RECORD CONVERSATION.)

18   BY MR. ROBIN:

19        Q.  Detective Readeau, I guess we'll mark this

20   as Readeau #1.

21             This will be #2.  The report will be -- that

22   we referred to earlier, the Mandeville police

23   report --

24        A.  Okay.

25        Q.  -- that will be #1.

64

1          (Exhibit #1 marked for identification.)

2          (Exhibit #2 marked for identification.)

3    BY MR. ROBIN:

4        Q.   Do you recognize the contents of this

5    document?

6          Is this what you looked at on the night of

7    the incident on the cell phone of the victim?

8        A.   (Examines document.)   Yeah, it appears to

9    be.

10       Q.   That's generally --

11       A.   It appears to be -- it appears to be, if not

12   in its entirety, a decent portion of text messages

13   in regards to the incident.

14       Q.   And your understanding, this took place in

15   the house; they were both in the house texting each

16   other after the alleged incident?

17       A.   Yeah, in separate rooms.

18       Q.   And, correct me if I'm wrong, but it appears

19   to me that the part of the message that's not

20   highlighted in black is the statements of the

21   victim?

22       A.   Yes.

23       Q.   And the part that's highlighted in dark

24   color, black or gray, whatever it is, that's the

25   accused; is that correct?

MISSISSIPPI        LOUISIANA
228.222.4549    504.908.5417

Gulf REPORTING
SERVICE, LLC
LEADING THE SOUTH IN COURT REPORTING,
VIDEO, AND LITIGATION TECHNOLOGY

65

1      A.   Yes.

2      Q.   And if you look at the bottom of the page,

3  statement of the alleged -- the statement of the

4  alleged victim, "I'm not going to get you in legal

5  trouble if that's" -- "I'm not going to get you in

6  legal trouble if that's your way of freaking about

7  it"?

8      A.   That's what it says, yes.

9      Q.   And you read that that night?

10     A.   I don't recall reading that.  Again, just to

11 expound upon that question, being an iPhone user

12 myself, I know how text messages on an iPhone can be

13 individually deleted.

14          If the text messages aren't produced and

15 presented to me in the form of forensic download,

16 then I take them as a grain -- with a grain of salt

17 because I know -- I know that those text messages

18 can be deleted and manipulated.

19          As such, I always refer to -- in the event

20 that a forensic download or a carrier search warrant

21 is produced, we default to that as -- in preference

22 over text messages produced by an individual holding

23 the phone.

24     Q.   But, in this case, the individual holding

25 the phone was the alleged victim that night?

66

1          She showed you this?

2      A.  She showed me a series of text messages.

3      Q.  And generally does that --

4      A.  Yeah, generally, this is consistent -- this

5  is consistent with what I reviewed in her phone as

6  well.

7      Q.  Did you obtain a forensic version of it like

8  you just described?

9      A.  We sought the text messages from the

10 carriers, not the individual devices.

11     Q.  Did you get that?

12     A.  No.  There were no text messages archived.

13     Q.  Won't you agree with me that this gives a

14 very serious conflicting account of the

15 circumstances?

16         MR. DETWEILER:

17             Object to the form.

18     A.  How so?

19 BY MR. ROBIN:

20     Q.  Well, for instance, the first thing, the

21 victim says, "I feel violated.  I don't understand

22 why you did that," and the response is, "Seriously,

23 you jumped in bed with me."

24         That kind of contradicts what she told you,

25 doesn't it?

MISSISSIPPI        LOUISIANA
228.222.4549     504.908.5417

*Gulf* REPORTING
SERVICE, LLC
LEADING THE SOUTH IN COURT REPORTING,
VIDEO, AND LITIGATION TECHNOLOGY

67

1      A.   It could, but the conversation indicates

2   that she felt like she was violated and/or

3   victimized in some way.

4      Q.   But it clearly shows that Mr. Liberto is

5   disputing it.

6      A.   It does, but, again, as I stated several

7   times, the facts of the case that were in dispute

8   was not that sexual contact had occurred.   It was

9   the consent of that contact, which is what this

10  series of texts relays to me, is a debate over the

11  consent of that contact.

12     Q.   Well, without reading all of Mr. Liberto's

13  input, is it fair to say he disagreed that

14  this was --

15     A.   Well, of course.

16     Q.   Well, let me finish.

17     A.   And the text message are consistent with the

18  statement he provided.

19     Q.   Just let me finish the question.

20  Mr. Liberto adamantly disagreed that this was

21  anything but consensual sex?

22          MR. DETWEILER:

23              Objection.   Form.

24     A.   I'd say that the indication in his text

25  messages is that he disagrees with her opinion that

68

1   it was not a consensual sexual contact, yes.

2   BY MR. ROBIN:

3       Q.  Did this cause you to have any doubts about

4   the credibility of what occurred during the

5   incident?

6       A.  It did not.

7       Q.  Why not?

8       A.  Because, again, based on the interviews and

9   my investigation, that the only facts that were in

10  contention were whether or not the contact, the

11  sexual contact, was consensual.

12      Q.  Well, the fact that she makes the statement,

13  "I'm not going to get you in legal trouble," that

14  doesn't have any bearing on it?

15      A.  That has no bearing to my investigation at

16  all.

17      Q.  Did you review anything else besides these

18  text messages?  Any other --

19      A.  Not that I recall.  I don't remember

20  reviewing anything.

21      Q.  Okay.  Give me one second.  I might be done.

22      A.  Okay.

23      Q.  Other than what's contained in the report,

24  the text messages, are you aware of any other

25  statements or alleged statements of the victim?

69

1      A.   No.

2      Q.   You hadn't seen anything else?

3      A.   No.   To be honest with you, she could show

4  up here and I probably wouldn't even recognize her.

5      Q.   What about with regard to the accused,

6  Mr. Liberto?

7      A.   No, sir.   I didn't know him prior to and

8  haven't seen him since.

9      Q.   So other than the conversation you had

10  during the arrest when -- we've already talked

11  about, and when you met with him and his attorney,

12  that's the only contact you had with him?

13      A.   That's it.

14           MR. ROBIN:

15               That's all I have.   Thank you.

16                      EXAMINATION

17  BY MR. DETWEILER:

18      Q.   Detective Readeau, did you then take the

19  information that was gathered during your

20  investigation and put that information into an

21  application for an arrest warrant?

22      A.   I did.

23      Q.   And when you decided to make out the

24  application for the arrest warrant, that was in

25  conjunction with consultation with your supervisor?

MISSISSIPPI          LOUISIANA
228.222.4549      504.908.5417

*Gulf*REPORTING
SERVICE, LLC
LEADING THE SOUTH IN COURT REPORTING,
VIDEO, AND LITIGATION TECHNOLOGY

1        A.   It was.

2        Q.   And he also agreed that the next step would

3    be to apply for an arrest warrant?

4        A.   He did.

5        Q.   And did he review the arrest warrant

6    application?

7        A.   He did.   I prepared it, and there's a way

8    with the software that we use where we can print out

9    a preview.   I printed it out and passed it to him.

10   He reviewed it for consistency of facts and any

11   grammatical or spelling errors.

12       Q.   Once the application for the arrest warrant

13   was prepared, what did you do with it?

14       A.   What do you mean what did I do with it?

15       Q.   What did you do with it?  Did you --

16       A.   Submitted it to the duty judge for review.

17       Q.   And who was the duty judge?

18       A.   Scott Gardner, I believe.

19       Q.   And he is a judge where?

20       A.   He is a judge with the 22nd Judicial

21   District in Covington.

22       Q.   So you presented him with the application

23   for the arrest warrant that include the facts of

24   your investigation?

25       A.   Yes.

1      Q.   Did you leave out any part of your

2  investigation from the application for the arrest

3  warrant?

4      A.   No.

5      Q.   Did you have any discussions with Judge

6  Gardner at the time that you applied for the arrest

7  warrant?

8      A.   I believe he -- he called me just to review

9  the affidavit.  I don't recall him having any

10  specific questions or issues.  He just called and

11  said, "Hey," you know, "going over your warrant.

12  I've got it.  I'll be sending it to you shortly."

13      Q.   And the next thing you know, Judge Gardner

14  signed the arrest warrant?

15      A.   Yes, the arrest warrant was approved.

16      Q.   Once the arrest warrant was approved, what

17  did you do?

18      A.   We took that and the search warrant and

19  immediately executed it.

20      Q.   Did you likewise put the contents of your

21  investigation into the application for the search

22  warrant?

23      A.   I did.

24      Q.   And that was also presented to Judge

25  Gardner?

72

1      A.   It was.

2      Q.   And he signed that?

3      A.   He did.

4      Q.   So you had an arrest warrant and search

5  warrant issued by Judge Gardner?

6      A.   Yes.

7      Q.   And the arrest warrant was -- your

8  understanding, was Judge Gardner establishing that

9  there was probable cause to arrest Mr. Liberto for

10  simple rape?

11      A.   Yes.

12          MR. ROBIN:

13              Objection.

14  BY MR. DETWEILER:

15      Q.   Did the arrest warrant allow you to arrest

16  Mr. Liberto for simple rape?

17      A.   It did.

18      Q.   And then you went and you arrested

19  Mr. Liberto?

20      A.   Yes.

21      Q.   Did you actually place handcuffs on

22  Mr. Liberto?

23      A.   I believe I did.

24      Q.   Was there any struggle at all?

25      A.   No.

73

1    Q.   Was any force used in handcuffing
2  Mr. Liberto?
3    A.   None other than the actual application of
4  the handcuffs.
5    Q.   Was there ever any type of physical
6  altercation or any type of force used, whatsoever,
7  with regard to Mr. Liberto?
8    A.   No.
9    Q.   Where did Mr. Liberto go after he was
10 arrested?
11   A.   He was placed into one of the marked patrol
12 units and transported to the Mandeville Police
13 complex.
14   Q.   What happened there?
15   A.   He would have been booked and placed in a
16 holding cell, awaiting transport.
17   Q.   Were you ever notified that Mr. Liberto was
18 claiming that he had been the victim of any type of
19 abuse during the arrest process?
20   A.   No.
21   Q.   Did you -- what would have happened to him
22 after he left Mandeville?
23   A.   He would have been transported to the
24 St. Tammany Parish Jail in Covington and released to
25 them for booking.

MISSISSIPPI          LOUISIANA
228.222.4549     504.908.5417


Gulf REPORTING
SERVICE, LLC
LEADING THE SOUTH IN COURT REPORTING,
VIDEO, AND LITIGATION TECHNOLOGY

74

1      Q.   To your knowledge, was he accepted into the

2   jail for booking?

3      A.   He was.

4      Q.   Was there any indication at that point that

5   Mr. Liberto was claiming he had been abused by his

6   arresting officers that night?

7      A.   No.

8      Q.   Prior to receiving this lawsuit, had you

9   ever heard or learned that there was any allegation

10  that Mr. Liberto had been abused or physically

11  assaulted by anyone from Mandeville on the night of

12  his arrest?

13     A.   No.

14     Q.   Did you ever have to attend any kind of

15  court hearing in this case?

16     A.   I attended a hearing prior to -- I guess it

17  was a probable cause hearing, or I don't know what

18  the legal definition of it was, but, yeah, there was

19  a hearing in Covington.

20     Q.   All right.  And what happened at the

21  hearing?

22     A.   I was notified that there was a hearing in

23  reference to the case, possibly to contest the

24  merits of the case.  I don't know if it was an

25  arraignment or whatnot.  I arrived and shortly

1    thereafter was notified that it appeared as if the

2    defense was going to stipulate to my report, which

3    would relieve me of having to testify.

4        Q.   Who notified you of that?

5        A.   The ADA.

6        Q.   Who was the ADA?

7        A.   Julie Knight.

8        Q.   Is that the same Julie Knight that was

9    sitting here today as the plaintiff's counsel?

10       A.   It was.

11       Q.   And what happened as a result of the

12   defendant stipulating to your report in criminal

13   court?

14       A.   Honestly, I don't know, because as soon as I

15   was told I could leave, I left.

16       Q.   Were you ever informed that probable cause

17   had been determined by Judge Penzato?

18       A.   I was not formally informed, but I assumed

19   as such when I was contacted by the Louisiana

20   Attorney General's office that they were picking up

21   the prosecution of the case.

22       Q.   Were you aware that Judge Penzato set

23   Mr. Liberto's bond at $35,000?

24       A.   I was not aware of the amount of bond.

25       Q.   Were you consulted in any way in her

76

1    determining what bond to set?

2        A.  I was not.

3        Q.  Were you consulted in any way in the

4    decision to remand Mr. Liberto into jail rather than

5    allowing him to be free, awaiting charges?

6        A.  I was not.

7        Q.  Do you ever have any decision in that

8    matter?

9        A.  No.  We're afforded the opportunity on a

10   case-by-case basis to contact the commissioner

11   and/or the judge to make requests, but, at the end

12   of the day, that's all it is.  It's not a request

13   (sic).  That ultimate decision is at the hands of

14   either the commissioner or the judge.

15       Q.  Do you -- were you aware that a parole hold

16   was placed on Mr. Liberto once he was incarcerated

17   after this arrest?

18       A.  I was informed of that fact when I met with

19   Mr. Liberto and Mr. Lindner at the jail for the

20   interview.

21       Q.  Do you know who that parole hold was placed

22   by?

23       A.  No idea.

24       Q.  Did you have any role in causing that parole

25   hold to be placed?

77

1      A.   No.   I don't recall talking to anybody from

2   Probation and Parole.

3      Q.   Do you have any authority to lift a parole

4   hold?

5      A.   I do not.

6      Q.   It's my understanding that the parole hold

7   wasn't lifted for some 80 to 85 days, as the

8   plaintiff alleges.

9           Did you have any role in keeping that parole

10  hold in place for those 80 to 85 days?

11     A.   No, I did not.

12     Q.   Do you know who, if anyone, eventually

13  lifted that parole hold?

14     A.   I do not.

15     Q.   And, again, that wouldn't have been your

16  authority or control, would it?

17     A.   No.

18     Q.   Have you ever been made aware of or do you

19  know -- strike that.

20          As you sit here today, is it your

21  understanding that probable cause was established in

22  criminal court?

23     A.   That's my understanding.

24     Q.   Probable cause was established by Judge

25  Gardner when he signed the affidavit for arrest?

78

1      A.   That's my understanding.

2      Q.   Have you ever heard of anyone, with the

3  exception of this lawsuit, questioning the existence

4  of probable cause for the arrest in criminal court?

5           In other words, some sort of proceeding

6  where anyone has challenged that?

7      A.   I have never been called and questioned as

8  to any proceedings or subpoena.

9      Q.   Is it your belief today, sitting here, that

10  based upon the investigation you conducted and the

11  application that you prepared, that there was

12  probable cause to arrest Luke Liberto on January 17,

13  2015?

14      A.   Yes.

15           MR. DETWEILER:

16              That's all the questions I have.

17                    RE-EXAMINATION

18  BY MR. ROBIN:

19      Q.   Just briefly in that regard.  This is the

20  application for the arrest warrant that you

21  presented to Judge Gardner?

22      A.   It is.

23      Q.   We'll mark that one as Readeau #3.

24           (Exhibit #3 marked for identification.)

25  BY MR. ROBIN:

79

1    Q.   Is it your understanding that -- well, the

2  application was for simple rape; is that correct?

3    A.   It is.

4    Q.   Is it your understanding that the charges

5  against -- well, that were dropped altogether, but,

6  before they were dropped, Judge Penzato only found

7  probable cause for sexual battery?

8    A.   I was not aware of that.

9    Q.   But those are two different crimes, aren't

10 they?

11   A.   They are.

12   Q.   Of the two, which is more serious?

13   A.   Simple rape, I believe.   I'd have to review

14 the statutes and the criminal consequences for them,

15 but I believe simple rape is more serious of a

16 crime.

17   Q.   You're correct.

18   A.   Okay.

19        MR. ROBIN:

20             That's all I have.   Thank you.

21        (Deposition adjourned at 12:38 p.m.)

22

23

24

25

1           C E R T I F I C A T E

2

3        Certification is valid only for a transcript

4    accompanied by my original signature and

5    Original required seal on this page.

6

7        I, Crystal Ballast, Certified Court Reporter

8    in and for the State of Louisiana, and Registered

9    Professional Reporter, as the officer before whom

10   this testimony was taken, do hereby certify that

11   DETECTIVE JASON READEAU, after having been duly

12   sworn by me upon authority of R.S. 37:2554, did

13   testify as hereinbefore set forth in the foregoing

14   79 pages; that this testimony was reported by me in

15   the stenotype reporting method, was prepared and

16   transcribed by me or under my personal direction and

17   supervision, and is a true and correct transcript to

18   the best of my ability and understanding; that the

19   transcript has been prepared in compliance with

20   transcript format guidelines required by statute or

21   by rules of the board, and that I am informed about

22   the complete arrangement, financial or otherwise,

23   with the person or entity making arrangements for

24   deposition services; that I have acted in compliance

25   with the prohibition on contractual relationships,

MISSISSIPPI          LOUISIANA
228.222.4549         504.908.5417


GulfREPORTING
SERVICE, LLC
LEADING THE SOUTH IN COURT REPORTING,
VIDEO, AND LITIGATION TECHNOLOGY

81

1   as defined by Louisiana Code of Civil Procedure

2   Article 1434 and in rules and advisory opinions of

3   the board; that I have no actual knowledge of any

4   prohibited employment or contractual relationship,

5   direct or indirect, between a court reporting firm

6   and any party litigant in this matter nor is there

7   any such relationship between myself and a party

8   litigant in this matter.  I am not related to

9   counsel or to the parties herein, nor am I otherwise

10   interested in the outcome of this matter.

11

12        This _____ day of _____, 2016.

13

14

15

16

17        _____
           CRYSTAL BALLAST, CCR, RPR
18

19

20

21

22

23

24

25

## #

**#1 (3)**
63:20,25;64:1
**#2 (2)**
63:21;64:2
**#3 (2)**
78:23,24

## $

**$35,000 (1)**
75:23

## A

**Absolutely (2)**
53:16;59:16
**abuse (2)**
42:1;73:19
**abused (2)**
74:5,10
**academy (1)**
9:18
**accepted (1)**
74:1
**access (1)**
24:6
**According (2)**
27:11;52:5
**account (1)**
66:14
**accountability (1)**
9:6
**accurate (1)**
56:22
**accuse (1)**
44:4
**accused (6)**
23:15;25:6,7;
43:22;64:25;69:5
**achieved (2)**
40:22,25
**act (3)**
32:10;45:10,12
**action (2)**
23:2;29:3
**active (1)**
6:7
**activity (2)**
14:17;39:14
**actual (2)**
49:16;73:3
**Actually (5)**
11:19;30:13;44:20;
63:7;72:21
**ADA (2)**
75:5,6
**adamantly (1)**
67:20
**Adamec (1)**
18:17

**addict (1)**
54:23
**address (2)**
5:5;52:8
**adjourned (1)**
79:21
**administering (1)**
4:23
**administrative (1)**
8:12
**administrator (1)**
38:12
**advance (1)**
18:23
**advice (1)**
28:2
**advised (3)**
37:6;46:19;60:6
**affidavit (1)**
33:23;71:9;77:25
**afforded (1)**
76:9
**afternoon (1)**
60:2
**again (17)**
24:18;25:1,13,19;
39:25;40:17;50:24;
59:13,24;60:6;61:24;
62:21,24;65:10;67:6;
68:8;77:15
**against (1)**
79:5
**agency (4)**
12:8;15:13,20,21
**ago (1)**
17:17
**agree (1)**
66:13
**agreed (3)**
4:3;61:2;70:2
**AGREEMENT (2)**
4:1;36:22
**alcohol (5)**
32:17;39:4;61:10,
15,23
**allegation (2)**
21:20;74:9
**alleged (15)**
21:19;25:4;26:17;
29:7;30:20;35:23;
43:20;49:24;50:18;
63:4;64:16;65:3,4,
25;68:25
**allegedly (1)**
53:1
**alleges (1)**
77:8
**allow (2)**
59:14;72:15
**allowed (1)**
41:20
**allowing (1)**
76:5

**almost (1)**
13:8
**altercation (1)**
73:6
**although (1)**
37:22
**altogether (2)**
40:16;79:5
**always (10)**
10:4;12:10;13:8,9;
19:8,19;22:20;30:4;
43:4;65:19
**amount (2)**
15:12;75:24
**analyst (1)**
23:24
**and/or (7)**
4:15;19:9;25:8;
28:14;53:22;67:2;
76:11
**announced (1)**
62:5
**anti-terrorism (1)**
6:15
**anymore (1)**
57:16
**appeared (1)**
75:1
**appears (5)**
35:6;64:8,11,11,18
**application (11)**
69:21,24;70:6,12,
22;71:2,21;73:3;
78:11,20;79:2
**applied (1)**
11:17;71:6
**applies (1)**
17:13
**apply (2)**
6:16;70:3
**appointed (1)**
60:4
**appropriate (5)**
25:15,16;49:12,20;
50:19
**approved (2)**
71:15,16
**approximately (4)**
37:11,12;51:15;
60:11
**April (3)**
18:4,15,20
**archived (1)**
66:12
**archives (1)**
38:13
**argue (1)**
62:2
**argumentative (1)**
50:7
**around (1)**
51:16
**arraignment (1)**

**74:25**
**arrangements (1)**
37:5
**arrest (49)**
14:5;16:8;24:16;
26:11,18;29:4,6;
40:23;43:2,5,18,22,
23;44:16;46:4,6,18,
20;47:3,5,6;48:8,16;
53:13;59:9;69:10,21,
24;70:3,5,12,23;71:2,
6,14,15,16;72:4,7,9,
15,15;73:19;74:12;
76:17;77:25;78:4,12,
20
**arrested (4)**
47:12,15;72:18;
73:10
**arresting (3)**
58:1;2;74:6
**arrests (2)**
13:23;58:6
**arrive (1)**
52:3
**arrived (2)**
12:24;74:25
**ascertain (2)**
13:15;54:19
**ascertaining (1)**
26:6
**ascertains (1)**
12:11
**aside (2)**
55:7,22
**asleep (7)**
31:11,12,15,16;
35:25;37:11;51:15
**aspect (5)**
6:17;8:16,20,21;
9:16
**aspects (1)**
9:1
**assaulted (2)**
12:24;74:11
**assigned (5)**
9:20,23;11:21,24;
25:22
**assignment (1)**
15:2
**assisted (1)**
36:22
**Associates (1)**
18:11
**Association (1)**
19:23
**assumed (1)**
75:18
**assumption (1)**
52:24
**attached (2)**
6:20;33:12
**attempt (6)**
24:15;25:7;43:17;

**45:18;49:4,7**
**attempted (1)**
37:4;43:10
**attend (4)**
16:19;17:15;18:24;
74:14
**attended (4)**
6:3;15:14;18:12;
74:16
**attorney (9)**
46:8;57:7,8,25;
58:17;59:2;62:8;
69:11;75:20
**attorney's (2)**
34:2;43:4
**audio/videotaped (1)**
20:25
**authored (1)**
34:23
**authority (2)**
77:3,16
**available (2)**
13:6;25:12
**Avenue (1)**
5:7
**awaiting (2)**
73:16;76:5
**awake (4)**
37:16;39:14,15;
61:7
**awarded (1)**
18:16
**aware (8)**
37:16,19;68:24;
75:22,24;76:15;
77:18;79:8
**away (1)**
52:11
**awoke (1)**
32:9
**awoken (2)**
31:13;37:14

## B

**background (2)**
5:23;6:5
**Ballast (1)**
4:21
**based (12)**
13:24;14:9;24:11;
25:24;48:13;51:2;
53:18;54:2;58:6;
62:15;68:8;78:10
**Basic (14)**
6:1,4;8:9,9,10,10;
9:15,16,20;12:12,25;
14:17;16:2,5
**basically (5)**
8:8,15;13:17;16:1;
19:1
**basis (6)**
23:19;24:18;25:3,

Luke Liberto v.
City of Mandeville, et al

Jason Redeaux
August 31, 2016

14;26:4;76:10
**bathroom (2)**
36:20;61:5
**battery (4)**
48:17,21,23;79:7
**bearing (4)**
45:9,14;68:14,15
**became (1)**
38:4
**Becky (2)**
34:14,16
**become (1)**
61:4
**becoming (3)**
36:12;37:19;50:6
**bed (9)**
32:7;37:11,24;
38:4;60:11,12,17,18;
66:23
**bedroom (6)**
32:4;36:14,20;
37:7;61:5;62:4
**beds (1)**
37:7
**began (4)**
60:19,20,22;62:2
**beginning (1)**
37:1
**belief (1)**
78:9
**believable (1)**
42:8
**besides (2)**
59:1;68:17
**best (4)**
29:3;48:19;61:8,10
**better (7)**
10:13,13,14,14;
30:8;43:21;44:2
**bit (1)**
36:16
**black (2)**
64:20,24
**block (5)**
15:12;19:10,20,23,
24
**bond (3)**
75:23,24;76:1
**booked (1)**
73:15
**booking (2)**
73:25;74:2
**both (4)**
8:4;28:22;29:10;
64:15
**bottom (1)**
65:2
**bounce (1)**
28:7
**brain (1)**
30:7
**briefly (3)**
15:24;53:15;78:19

**bring (1)**
21:13
**broken (1)**
37:3
**browbeating (1)**
24:22
**building (1)**
22:3

## C

**call (6)**
5:19;34:18;38:17;
57:12,15;58:14
**called (5)**
11:23;12:25;71:8,
10;78:7
**callout (2)**
30:5,15
**callouts (1)**
30:5
**calls (1)**
14:18
**came (1)**
7:9
**can (31)**
5:19;12:17;13:24;
17:25;18:1,2;20:5,8;
33:14,21;35:13,25;
36:5,8,16;39:8;41:4,
9,13,15;44:4;53:15;
54:12,16,17;55:10;
63:11,12;65:12,18;
70:8
**capacity (2)**
5:13;7:11
**care (2)**
7:16;9:5
**carried (1)**
47:7
**carrier (3)**
55:24;63:16;65:20
**carriers (1)**
66:10
**case (49)**
13:13;17:5;21:7,
18;22:25;23:21;24:2,
6;25:13,19,23;26:7,9,
10,25;28:3,5,10,15,
18,19,20;29:8;30:10,
21;38:15;40:18;41:6;
42:21,22;50:22;51:6;
54:19;56:24,25;57:9,
22;58:10,13,25;
59:13;62:20,25;
65:24;67:7;74:15,23,
24;75:21
**case-by-case (5)**
23:19;24:18;25:3,
14;76:10
**cases (7)**
14:22;15:1;26:12;
28:2;43:3,15,16

**cast (1)**
55:11
**cause (13)**
4:17;26:5;40:21,
25;68:3;72:9;74:17;
75:16;77:21,24;78:4,
12;79:7
**caused (1)**
31:18
**causing (1)**
76:24
**cell (3)**
55:24;64:7;73:16
**certain (2)**
9:18;63:11
**certainly (1)**
45:13
**certificates (1)**
17:18
**Certification (5)**
6:1,2;8:10,11;9:15
**Certified (1)**
4:21
**certifies (1)**
18:12
**challenged (1)**
78:6
**change (2)**
42:21;60:15
**changed (1)**
54:1
**charged (2)**
47:14;49:9
**charges (2)**
76:5;79:4
**check (2)**
9:7;30:17
**checklist (2)**
25:21;54:16
**Chicago (1)**
18:11
**chores (1)**
36:23
**chronologically (1)**
33:24
**circumstances (4)**
11:5;49:13;50:13;
66:15
**Civil (3)**
4:6;11:18,19
**claiming (3)**
12:23;73:18;74:5
**classes (1)**
7:21
**classroom (3)**
8:4,8;19:5
**clear (1)**
54:16
**clear-cut (1)**
25:21
**clearly (2)**
37:16;67:4
**Clerk (1)**

4:12
**clocked (1)**
30:17
**close (1)**
26:25
**clothing (1)**
39:22
**coerce (1)**
24:24
**collect (2)**
21:1;40:20
**collected (2)**
23:6,7
**collection (2)**
16:4,8
**college (1)**
5:25
**color (1)**
64:24
**commissioner (2)**
76:10,14
**commitment (1)**
33:5
**committed (1)**
50:15
**company (3)**
6:14;15:22,22
**complaint (3)**
20:16,19;21:6
**completed (1)**
18:13
**complex (1)**
73:13
**comply (1)**
10:19
**concerned (2)**
6:21;21:17
**concur (1)**
31:6
**conduct (13)**
14:17,18;16:2;
20:23;23:4,10;24:11,
15;25:24;29:1;55:2,
21;58:8
**conducted (9)**
13:25;14:9;28:23;
30:21,22,22;31:3;
62:16;78:10
**conducting (5)**
16:3;19:25;41:21;
55:9;56:6
**conference (2)**
19:1;29:25
**conflicting (1)**
66:14
**conjunction (1)**
69:25
**conscious (1)**
61:8
**consensual (8)**
45:7,10,15;50:25;
63:2;67:21;68:1,11
**consent (8)**

32:18;44:22;45:7;
47:19;51:5;59:14;
67:9,11
**consenting (1)**
48:6
**consequences (1)**
79:14
**consider (3)**
42:12;44:15;48:16,
21
**consideration (1)**
43:7
**considered (1)**
48:22
**considering (1)**
49:23
**consisted (1)**
12:11
**consistency (1)**
70:10
**consistent (3)**
66:4,5;67:17
**constantly (2)**
9:4;28:8
**consultation (1)**
69:25
**consulted (3)**
28:15;75:25;76:3
**consumed (1)**
61:9,10,15,22
**contact (22)**
21:12;22:7,13;
37:9;38:11;44:20;
45:2,21,25;46:7;
47:7;50:25;54:6;
55:23;67:8,9,11;68:1,
10,11;69:12;76:10
**contacted (4)**
52:21;57:7;62:18;
75:19
**contacts (1)**
12:13
**contained (3)**
53:7;56:11;68:23
**contemporaneous (2)**
8:1;29:18
**contention (4)**
45:4,6;49:22;68:10
**contents (3)**
48:14;64:4;71:20
**contest (1)**
74:23
**continued (1)**
37:2
**continuing (2)**
6:4;18:15
**contradictory (3)**
53:24;55:3,7
**contradicts (1)**
66:24
**control (3)**
7:15,17;77:16
**conversation (4)**

63:13,17;67:1;69:9
**conviction (1)**
26:7
**cooperate (1)**
46:15
**Corps (2)**
6:8,23
**Correction (1)**
5:25
**Corrections (10)**
7:12,13;8:21,22;
9:5,15;10:4,5;11:21,
25
**correctly (1)**
11:12
**Council (2)**
15:13,20
**COUNSEL (6)**
4:1,4;45:24;47:9,
21;75:9
**couple (3)**
17:17;57:14;59:8
**course (12)**
15:14;18:13,20;
19:8,10,23,25;28:12;
29:3;40:9;55:6;67:15
**courses (2)**
19:19;23:22
**Court (7)**
4:12,21;9:9;74:15;
75:13;77:22;78:4
**covered (2)**
8:20;9:18
**Covington (4)**
5:8;70:21;73:24;
74:19
**crash (1)**
14:20
**credibility (11)**
13:6;17:3;20:10;
22:19;41:3;53:21;
54:4,10,12;55:11;
68:4
**credible (27)**
16:25;26:18,22,23,
25;31:4;41:11,13;
42:1,9;43:21;53:3,5,
9,10,12;55:19;56:14,
17,20;57:1;58:19,23;
62:12,13,22,23
**credits (1)**
18:16
**crime (10)**
16:5;23:7;47:16;
48:2,4;50:14;53:22;
54:17,24;79:16
**crimes (2)**
12:10;79:9
**criminal (9)**
12:1;16:2;38:15;
54:21;56:23;75:12;
77:22;78:4;79:14
**Crystal (1)**

4:21
**cuddle (1)**
60:19
**curriculum (1)**
16:21
**custody (2)**
7:16;9:6

**D**

**dark (1)**
64:23
**databases (1)**
24:7
**date (1)**
17:19
**dated (1)**
18:14
**day (2)**
18:23;76:12
**days (5)**
16:22;18:22;59:9;
77:7,10
**deactivate (1)**
26:25
**deal (1)**
28:6
**dealing (1)**
24:4
**debate (1)**
67:10
**decent (1)**
64:12
**decide (1)**
30:1
**decided (1)**
69:23
**decision (4)**
30:3;76:4,7,13
**deem (3)**
26:4;50:2;53:4
**deemed (1)**
51:2;53:8
**default (1)**
65:21
**defendant (1)**
75:12
**defender (1)**
60:4
**defense (1)**
75:2
**defensive (2)**
8:9,9
**defer (2)**
22:23;27:21
**defined (1)**
47:17
**definitely (1)**
28:13
**definition (2)**
27:10;74:18
**degree (1)**
47:19

**deleted (3)**
63:12;65:13,18
**delivered (1)**
4:11
**Delta (1)**
5:7
**delve (2)**
38:5;63:13
**departing (1)**
11:9
**Department (8)**
5:12;6:10;21:20;
34:3,4;35:3;41:17;
53:18
**depending (2)**
30:10;52:16
**depends (2)**
25:13;27:10
**deposition (2)**
4:10;79:21
**describe (1)**
31:17
**described (1)**
66:8
**detail (1)**
38:6
**detailed (1)**
9:19
**details (1)**
57:20
**detected (2)**
54:5,8
**DETECTIVE (21)**
4:4;5:1,17,18,20;
8:24;12:13;13:2,9,
19;14:14;15:13;
19:18;21:4;25:22;
30:5;34:1;41:11;
60:3;63:19;69:18
**determination (9)**
13:14;16:6;20:9;
22:12;25:25;31:7;
41:24;56:21,22
**determine (17)**
13:6;16:24;22:18;
23:4;24:12;26:4,16;
31:4;40:18,24;41:10;
43:20;54:12;55:13,
24;56:13;58:8
**determined (11)**
25:20;29:2;42:7,
20;44:21;48:19,20;
53:10,12;56:24;
75:17
**determines (1)**
25:20
**determining (3)**
17:2;20:9;76:1
**DETWEILER (22)**
20:4;25:9,17;27:8;
33:16,20;36:1,15;
38:19;39:6;41:18;
42:3;43:24;49:14;

50:5,10;59:3;66:16;
67:22;69:17;72:14;
78:15
**devices (1)**
66:10
**difference (3)**
46:23;47:2,10
**different (6)**
8:24;9:2,8;24:7;
42:23;79:9
**dig (1)**
38:12
**disagreed (2)**
67:13,20
**disagrees (1)**
67:25
**disciplinaries (1)**
8:18
**discovery (1)**
38:22
**discretion (10)**
13:5;22:17,20;
25:23;27:2,5,6;
41:21;42:1;43:8
**discuss (1)**
58:25
**discussed (2)**
28:18,25
**discussion (2)**
57:21;59:19
**discussions (2)**
28:21;71:5
**dispute (1)**
67:7
**disputing (1)**
67:5
**District (2)**
43:4;70:21
**document (7)**
18:6,8,10;34:19;
35:20;64:5,8
**documented (1)**
59:17
**done (5)**
26:12;27:6;28:1;
43:15;68:21
**dorms (1)**
8:20
**dose (1)**
60:19
**doubts (1)**
68:3
**down (2)**
28:4;36:16
**download (2)**
65:15,20
**dream (1)**
37:17
**dressed (2)**
32:7;38:4
**drive (1)**
52:16
**dropped (2)**

79:5,6
**drug (2)**
39:4;54:22
**drugs (3)**
32:17;61:11,17
**due (1)**
48:6
**duly (1)**
5:2
**during (8)**
40:8;60:23,25;
61:8;68:4;69:10,19;
73:19
**duties (3)**
7:13;14:16;27:13
**duty (6)**
6:7;21:23;29:6;
30:13;70:16,17

**E**

**earlier (5)**
19:11;38:2;41:2;
63:3,22
**early (3)**
13:10;30:19;60:9
**education (2)**
6:4;18:16
**educational (1)**
5:23
**Eighteen (1)**
18:15
**either (7)**
14:5;19:5;20:23,
24;54:20;58:22;
76:14
**elect (1)**
41:4
**else (5)**
54:1;59:1;62:14;
68:17;69:2
**emotional (2)**
40:9;61:4
**employed (2)**
5:11,13
**employment (1)**
7:22
**encounter (3)**
44:22;61:8;63:1
**end (4)**
24:5;57:18;58:5;
76:11
**ended (1)**
63:14
**enforcement (11)**
5:10;6:4,18,21;
7:25;9:17;14:20;
15:23;20:3;23:24;
53:20
**engage (3)**
27:20;57:21;60:20
**engaged (1)**
31:13

engaging (1)
  32:10
enough (4)
  12:18;39:14,15;
  42:9
ensued (1)
  63:4
entail (2)
  23:5,6
entered (2)
  60:14,15
entirety (1)
  64:12
equate (1)
  42:22
errors (1)
  70:11
especially (1)
  63:11
established (2)
  77:21,24
establishing (1)
  72:8
evaluate (1)
  58:12
evaluation (1)
  16:3
even (6)
  15:11;22:3,4;
  23:25;52:25;69:4
evening (1)
  37:10
event (1)
  65:19
events (1)
  47:11
eventually (1)
  77:12
everybody (2)
  9:7;23:25
evidence (8)
  16:5,9;23:5,6,7,8;
  38:15;55:4
Exactly (3)
  17:14;22:6;24:4
EXAMINATION (3)
  5:3;63:14;69:16
examined (1)
  5:2
examines (2)
  35:20;64:8
except (1)
  4:14
exception (2)
  59:14;78:3
exchange (1)
  36:23
execute (1)
  58:9
executed (1)
  71:19
execution (1)
  27:12

exercise (1)
  41:21
exhibit (8)
  33:15,19,22,23;
  34:2;64:1,2;78:24
existence (1)
  78:3
exists (1)
  38:20
exited (1)
  62:4
EXITS (1)
  35:21
experience (4)
  27:23,24;53:19;
  54:3
expert (1)
  39:17
explain (2)
  37:2;41:9
explained (6)
  31:15;36:10,24;
  37:15;55:8;62:24
expound (2)
  53:15;65:11
extent (1)
  9:18
extreme (1)
  53:24
eyewitness (2)
  49:18;50:1

F

face (1)
  43:1
facilities (1)
  9:8
fact (10)
  11:12;30:10;38:3;
  42:21;45:4,6,20;
  50:14;68:12;76:18
facts (25)
  12:12;13:15,20;
  16:3,7;20:9;21:5;
  25:19;26:6,24;40:18,
  19;48:20;49:21;
  50:22;53:23;54:19;
  55:3;58:9,9;59:12;
  67:7;68:9;70:10,23
factual (1)
  26:4
failure (1)
  10:19
fair (2)
  53:11;67:13
fall (1)
  13:9
fallen (2)
  31:12;35:25
far (5)
  6:20;7:3;21:16;
  26:8;52:11

fashion (1)
  10:16
FAST (1)
  6:13
Favret (3)
  44:13,16,24
February (1)
  7:9
Federal (1)
  4:6
feed (1)
  8:18
feeding (1)
  8:18
feel (4)
  20:12;37:11;40:21;
  66:21
feeling (1)
  37:14
fell (1)
  51:15
felonies (1)
  12:10
felony (1)
  50:18
felt (5)
  28:10;31:17;37:17;
  57:22;67:2
few (2)
  12:17;34:22
field (2)
  8:14;19:13
file (5)
  17:18;21:7;28:6;
  40:18;62:20
filed (2)
  38:21;52:13
filing (1)
  4:12
find (6)
  41:12;53:3,4;
  56:17,19;62:12
fine (1)
  5:21
finish (2)
  67:16,19
first (7)
  5:1;7:3;22:1;24:1,
  10;45:21;66:20
fit (1)
  29:22
five (1)
  26:12
five-minute (1)
  52:16
flags (1)
  54:3
flow (1)
  63:13
follow (1)
  57:4,16
followed (1)
  33:23

follows (1)
  5:2
follow-up (5)
  14:19;21:13;30:23;
  56:2;59:7
force (7)
  6:15;8:13;24:19;
  47:19;48:5;73:1,6
forces (1)
  6:14
forensic (3)
  65:15,20;66:7
foreplay (1)
  60:21
form (5)
  4:14;25:10;65:15;
  66:17;67:23
formal (3)
  20:23;56:1,1
formally (1)
  75:18
formulation (1)
  34:10
forward (4)
  43:19;57:3,22;
  58:20
found (5)
  37:20;55:18;62:13,
  21;79:6
Four (2)
  6:7;16:22
fourth (1)
  18:23
freaking (1)
  65:6
free (2)
  58:5;76:5
Friday (1)
  11:16
friend (2)
  52:21;62:6
front (1)
  60:15
full (1)
  5:5
fully (2)
  32:7;60:6
functioned (1)
  6:20
further (4)
  21:15;36:24;37:21;
  56:6

G

Gardner (8)
  70:18;71:6,13,25;
  72:5,8;77:25;78:21
gather (1)
  24:7
gathered (1)
  69:19
gathering (1)

23:5
gave (3)
  46:23;51:12,16
general (2)
  30:7;43:16
generally (4)
  32:24;64:10;66:3,4
General's (4)
  57:8;58:17;59:2;
  75:20
generated (1)
  34:3
gentleman (1)
  58:16
germane (1)
  50:14
gets (2)
  22:14;23:2
Gina (4)
  44:13,14,25;49:2
gist (1)
  15:25
given (2)
  25:23;51:5
gives (1)
  66:13
giving (2)
  24:25;41:4
goal (2)
  13:14;26:4
go-between (1)
  13:18
Gonzales (1)
  15:16
good (2)
  11:4;18:18
graduate (1)
  5:24
grain (2)
  65:16,16
grammatical (1)
  70:11
grand (2)
  43:2,6
gray (1)
  64:24
guess (4)
  18:18,22;63:19;
  74:16
guides (1)
  27:12

H

habit (2)
  24:22;53:20
half (1)
  19:20
hand (1)
  47:3
handcuffing (2)
  8:10;73:1
handcuffs (2)

72:21;73:4
**handed (2)**
  18:10;47:21
**handing (1)**
  8:19
**handle (3)**
  13:16;14:22;46:9
**handling (1)**
  57:12
**hands (1)**
  76:13
**handwritten (1)**
  21:2
**happen (1)**
  50:18
**happened (4)**
  73:14,21;74:20;
  75:11
**happens (1)**
  14:4
**harassment (1)**
  8:12
**heard (2)**
  74:9;78:2
**hearing (7)**
  41:25;74:15,16,17,
  19,21,22
**help (3)**
  16:23;33:14;35:19
**helping (1)**
  17:2
**hereby (2)**
  4:5;18:11
**Hey (5)**
  19:15;21:8;57:12,
  15;71:11
**High (1)**
  5:24
**highlighted (2)**
  64:20,23
**himself (1)**
  61:1
**hire (2)**
  8:8;11:7
**hired (3)**
  11:20;14:14,15
**histories (1)**
  42:25
**Hold (8)**
  33:21;76:15,21,25;
  77:4,6,10,13
**holding (4)**
  47:3;65:22,24;
  73:16
**home (3)**
  7:9;36:11;37:12
**Homeland (1)**
  23:23
**homeless (2)**
  36:13;54:22
**Homicide (1)**
  19:22
**honest (1)**

69:3
**Honestly (3)**
  17:18;30:19;75:14
**hospital (3)**
  12:22,23,25
**hour (2)**
  19:21;52:19
**hours (7)**
  6:3;15:18;19:21;
  37:11,13,13;60:11
**house (7)**
  44:25;45:8;49:1;
  50:20;52:23;64:15,
  15
**household (2)**
  36:23;49:24
**housing (1)**
  7:15
**human (3)**
  55:14
**hundreds (1)**
  6:3

## I

**idea (2)**
  30:17;76:23
**ideas (1)**
  28:8
**identification (3)**
  64:1,2;78:24
**Illinois (1)**
  18:11
**immediate (1)**
  46:6
**immediately (5)**
  7:6;11:9;45:24;
  62:1;71:19
**important (3)**
  20:3,8;33:1
**incapable (3)**
  32:18;47:20;48:6
**incarcerated (1)**
  76:16
**incident (20)**
  17:20;21:17;25:5;
  34:5;42:24,24;48:3;
  49:24;52:7;56:7;
  60:8;61:11,19,22;
  62:2;63:4;64:7,13,
  16;68:5
**include (5)**
  23:11,13,15;30:1;
  70:23
**included (2)**
  39:10;40:17
**includes (1)**
  34:13
**inconsistencies (1)**
  54:8
**independent (1)**
  35:13
**in-depth (5)**

9:19;13:21;21:15,
  16;63:14
**indicate (1)**
  51:13
**indicates (2)**
  55:5;67:1
**indication (2)**
  67:24;74:4
**indicators (3)**
  54:11;55:10,10
**individual (3)**
  65:22,24;66:10
**individually (1)**
  65:13
**individuals (1)**
  42:23
**inevitably (1)**
  22:1
**influence (3)**
  32:17,22;39:3
**informal (2)**
  19:12;20:23
**information (5)**
  24:7;40:20;44:19;
  69:19,20
**informed (4)**
  54:7;75:16,18;
  76:18
**initial (14)**
  9:22;13:11,15,20;
  14:18;16:3;20:20;
  21:14,25;22:7;29:10;
  45:21;51:8;55:22
**initially (2)**
  34:17;41:10
**inmates (3)**
  7:16;8:19;9:6
**input (1)**
  67:13
**inserted (1)**
  60:23
**inside (1)**
  37:21
**instance (3)**
  25:4;50:4;66:20
**Institute (3)**
  16:15,17;17:15
**Insubordination (3)**
  10:19,21,23
**intelligence (1)**
  23:24
**intercourse (5)**
  31:14;40:4;47:18;
  60:22,25
**internal (1)**
  10:20
**International (1)**
  19:22
**interrogate (2)**
  20:7;55:1
**interrogating (1)**
  53:21
**interrogation (11)**

16:11,12,18;17:4,
  11;18:14;19:1,2,9;
  39:19,20
**interrogator (1)**
  39:18
**interview (47)**
  12:25;16:12;17:6;
  18:25;20:7,24,24,25;
  21:13;24:11;25:7;
  26:17;28:22,23,24;
  29:7,16,20,23,24;
  30:20,23;31:3;38:8;
  39:20;42:12,20;
  43:12,17,22;44:15;
  49:4,7,12;50:2,19;
  51:3,7,8;55:2,3,9;
  56:7;59:7;62:7,16;
  76:20
**interviewed (2)**
  24:14;49:22
**interviewing (8)**
  16:4,18;17:3,11;
  18:14;19:2,9,14
**interviews (10)**
  19:25;23:4,10;
  24:15;29:2,17;54:6;
  55:21;56:2;68:8
**intimate (3)**
  32:1;37:2,8
**into (14)**
  13:13,21;21:19;
  24:25;38:5;60:17,18,
  24;63:14;69:20;
  71:21;73:11;74:1;
  76:4
**intoxication (1)**
  48:7
**investigation (31)**
  9:11,12,14,22,24;
  10:20;12:9,14;13:3,
  11,25;14:9,19,20,25;
  22:22;24:8,23;25:24,
  25;28:13;41:22;
  50:23;58:8;68:9,15;
  69:20;70:24;71:2,21;
  78:10
**investigation-based (1)**
  19:19
**investigations (9)**
  6:19;7:1;9:20,21;
  12:6,7;15:3;16:2;
  40:23
**investigative (2)**
  6:16;15:23
**investigative-based (1)**
  19:8
**investigator (2)**
  15:14;25:20
**investigators (2)**
  12:9;19:22
**investigatory (2)**
  6:25;20:11
**invoked (2)**

45:24;46:13
**invoking (1)**
  47:8
**involved (4)**
  23:22;24:3,8;36:25
**involvement (1)**
  57:18
**iPhone (2)**
  65:11,12
**issuance (1)**
  28:19
**issue (7)**
  13:16;28:14;29:3,
  5;43:23;50:24;62:25
**issued (4)**
  14:2;46:2;47:6;
  72:5
**issues (2)**
  54:5;71:10
**issuing (1)**
  43:22

## J

**jail (7)**
  7:18;59:8;60:5;
  73:24;74:2;76:4,19
**January (11)**
  5:14;17:21;20:1,
  12;37:3,9,10;60:3,9,
  10;78:12
**JASON (4)**
  4:5;5:1,7;18:12
**Jason's (1)**
  33:22
**job (9)**
  8:2,16,21;10:13;
  11:17;19:5;27:25;
  40:18;57:25
**John (4)**
  4:11;5:22;18:10;
  60:4
**Joseph (1)**
  5:7
**judge (19)**
  29:6;40:24;48:9;
  70:16,17,19,20;71:5,
  13,24;72:5,8;75:17,
  22;76:11,14;77:24;
  78:21;79:6
**judging (1)**
  42:25
**judgment (2)**
  22:23;27:21
**Judicial (1)**
  70:20
**Julie (2)**
  75:7,8
**July (1)**
  7:10
**jumped (1)**
  66:23
**jury (2)**

43:2,6

**K**

keep (1)
51:9
keeping (2)
9:6;77:9
kind (5)
13:17;29:16;39:1;
66:24;74:14
kitchen (1)
61:6
knew (4)
44:24;45:5;46:14;
51:4
KNIGHT (3)
35:21;75:7,8
Knowing (1)
20:7
knowledge (3)
61:9,10;74:1

**L**

lack (3)
41:3;54:3,9
lady (3)
53:8;58:17,18
Lafayette (3)
36:12;52:10,11
larger (1)
12:8
Last (1)
59:22
late (1)
37:1
later (1)
57:14
latitude (1)
25:23
law (11)
4:7;5:10;6:3,17,21;
7:25;9:17;15:23;
20:3;23:23;53:19
laws (1)
27:11
lawsuit (2)
74:8;78:3
lawyer (1)
45:23
laying (1)
60:12
laymen (1)
51:22
leading (1)
26:5
leads (1)
26:1
learn (1)
19:1
learned (1)
74:9

lease (1)
36:22
least (1)
12:19
leave (6)
10:9,11;40:24;
61:25;71:1;75:15
leaving (2)
11:2;62:6
left (8)
7:4;11:4,13,15;
61:5;62:6;73:22;
75:15
legal (4)
65:4,6;68:13;74:18
lend (1)
6:24
letting (1)
58:24
level (2)
40:21,25
levels (1)
22:14
Liberto (48)
5:22;31:12,23;
32:1,4;33:4;36:11,
24;37:6;40:12;42:13,
21;43:12;45:10;
47:12;53:13;59:8,12;
60:4,6,10,16,18,21,
23,25;61:3,7;62:8,12,
18;67:4,20;69:6;
72:9,16,19,22;73:2,7,
9,17;74:5,10;76:4,16,
19;78:12
Liberto's (5)
44:9;45:13;51:3;
67:12;75:23
lieu (1)
43:6
Lieutenant (8)
27:17;28:10;29:15;
30:2,3,11;31:1,6
lift (1)
77:3
lifted (2)
77:7,13
likewise (1)
71:20
Lindner (6)
59:8;60:5;62:9,17,
17;76:19
list (1)
23:21
little (1)
36:16
live (1)
29:19
living (6)
31:19;36:11;37:4,
5;44:10;62:5
logbook (1)
8:17

logical (1)
47:4
long (4)
10:6;15:17;16:21;
34:8
long-term (1)
33:5
look (4)
34:25;35:17;57:15;
65:2
looked (1)
64:6
looking (1)
24:2
lot (2)
9:11;19:18
Louisiana (5)
4:22;5:8,25;6:1;
48:18;57:8;75:19
loved (1)
40:12
Luke (4)
5:22;37:20;40:3;
78:12
lying (1)
55:5

**M**

machine (1)
38:13
maintained (1)
14:2
maintaining (1)
9:5
major (2)
12:10,10
makes (3)
20:15;21:20;68:12
Man (1)
7:15
Mandeville (21)
5:12;6:10;10:12;
11:8,20,23;14:13;
15:4;21:19;34:2,4;
35:2;36:12;41:16;
52:4,10;53:18;63:22;
73:12,22;74:11
manipulate (1)
63:12
manipulated (1)
65:18
manner (1)
12:24
March (4)
6:10;7:9;10:10;
11:11
Marine (2)
6:7,23
Marines (2)
6:11;7:4
mark (2)
63:19;78:23

marked (4)
64:1,2;73:11;78:24
matter (8)
17:4;30:5;40:22;
43:3;53:17;54:25;
63:10;76:8
may (11)
19:20,21;21:1;
23:8,8;24:5,5;44:7;
51:5,5,6
Maybe (1)
11:15;30:18;33:14;
57:14
mean (14)
6:2;10:24;20:16;
26:2;28:7;39:13;
41:2;50:4;54:14,23;
55:14,16;59:4;70:14
means (2)
23:24;48:7
meat (1)
13:13
medical (1)
9:9
memory (1)
35:19
mentioning (1)
32:23
merely (1)
42:22
merits (2)
58:13;74:24
message (3)
62:3;64:19;67:17
messages (17)
56:4;63:4,7,8,11,
16;64:12;65:12,14,
17,22;66:2,9,12;
67:25;68:18,24
met (3)
60:3;69:11;76:18
Michael (1)
18:17
mid-December (1)
36:13
might (2)
55:11;68:21
military (1)
6:13
mind (2)
39:12;59:24
minds (1)
30:7
mine (1)
18:18
minimum (2)
22:16;30:9
minutes (2)
52:17,19
Miranda (1)
60:6
Monday (2)
11:14,16

monitored (1)
29:21
monitoring (1)
29:19
month (2)
57:14;58:6
months (1)
7:8
more (10)
6:14,16,20,21;9:5,
12;27:24;38:5;79:12,
15
morning (7)
30:18;45:20;51:25;
52:1,2,17;60:9
Most (2)
22:3,25
mother's (1)
62:1
motion (1)
33:15
motivation (1)
33:8
motivations (1)
40:16
move (1)
43:19
much (2)
12:8;59:13
mutual (1)
60:20
myself (2)
34:24;65:12

**N**

name (4)
5:5;15:21;28:5;
44:14
names (2)
19:15;24:3
narrative (2)
34:20;35:3
narratives (1)
34:23
NCIC (1)
14:5
necessarily (2)
6:16;13:8
necessary (2)
50:2;51:3
need (3)
23:4;24:13;58:14
new (4)
8:8;15:13;16:20;
37:4
next (2)
70:2;71:13
night (15)
28:17;30:2;45:19;
48:3;55:19;60:9,12;
61:11,19,22;64:6;
65:9,25;74:6,11

nolle (1)
57:17
None (2)
54:5;73:3
note (3)
39:9;40:8,17
noted (1)
60:16
Notice (3)
4:6;39:4,14
noticed (2)
37:22;39:13
notified (7)
13:1;21:5;30:11;
73:17;74:22;75:1,4
notifies (1)
12:12
notify (3)
22:11,21;28:2
noting (1)
33:9
notwithstanding (1)
43:9
number (1)
35:1
numbers (1)
33:19

**O**

oath (1)
4:24
Object (1)
66:17
Objection (13)
20:5;25:10,18;
27:9;39:7,8;41:19;
42:4;43:25;49:15;
50:6;67:23;72:13
objections (1)
4:14
obliged (1)
62:20
observation (1)
9:12
observed (3)
29:17;31:1;61:3
obtain (4)
29:1;43:18;57:6;
66:7
obtained (2)
55:4;58:10
obtaining (1)
48:16
obvious (1)
39:9
OC (1)
8:10
occupation (1)
5:9
occur (1)
50:13
occurred (15)

14:7;17:21;29:19;
35:24;44:21;45:2,5,6,
12;49:25;60:8;63:1,
5;67:8;68:4
October (1)
37:1
off (6)
13:24;22:22;28:8;
30:15;54:9;60:19
offense (1)
50:1
offer (2)
10:13;50:21
offered (5)
11:22,23,25;61:25;
62:19
Office (31)
6:8;7:7,10,21,23;
10:1,7,9,16;11:2,4,
10,13,22;12:1,2,3,8,
16;13:5,22;14:2;
15:6;28:20;38:10;
43:4;53:19;57:8;
58:17;59:2;75:20
officer (16)
5:10;6:1;7:12,14;
20:21;21:6,8,25;
28:24;30:6;34:13,17;
41:20;54:7;58:1,2
officers (4)
9:17;19:13;53:20;
74:6
Officially (1)
5:16
officiated (1)
4:23
OFF-RECORD (2)
59:19;63:17
often (1)
22:25
on-and-off (1)
36:25
on-call (2)
12:13;13:1
once (5)
23:2;40:20;70:12;
71:16;76:16
on-duty (1)
12:9
one (17)
8:7;12:19,20,22;
23:22;30:8;34:21,23;
48:23;53:25;55:22,
23;56:9;63:8;68:21;
73:11;78:23
ones (2)
35:1,4
only (15)
14:6;15:4;19:20;
25:6;26:11;27:5;
44:14;45:11;47:9;
49:20;50:24;56:9;
68:9;69:12;79:6

on-the-job (4)
8:5,16;9:14;19:12
operational (1)
6:17
opinion (2)
45:17;67:25
opportunity (3)
10:14;62:19;76:9
opposed (1)
17:9
opted (2)
12:3;48:24
options (1)
43:1
oral (3)
31:17;37:18;60:21
order (3)
13:13;24:7;28:14
original (1)
4:10
originally (1)
38:15
Orleans (1)
16:20
out (14)
7:8;8:19;9:8;
13:16;24:14;26:25;
30:11;38:12;47:7;
55:11;69:23;70:8,9;
71:1
over (9)
6:2;12:14;13:2;
27:15;28:22;46:4;
65:22;67:10;71:11

**P**

page (7)
35:1,2,5,5,5;59:21;
65:2
pages (2)
26:13;34:7
paid (1)
58:12
pairs (1)
30:9
pants (1)
37:23
paper (1)
47:22
paragraph (1)
59:22
Parish (4)
6:8;7:7;60:5;73:24
parole (8)
76:15,21,24;77:2,3,
6,9,13
part (11)
9:16;13:5;16:23;
17:2;20:11;22:17;
41:3;54:10;64:19,23;
71:1
participate (2)

24:23;29:15
participated (1)
34:10
particular (1)
28:3
pass (1)
22:21
passed (1)
70:9
past (1)
38:21
PATC (1)
19:10
path (1)
25:25
patrol (8)
10:5;12:1,4,5;
14:17;28:24;34:17;
73:11
patrol-level-type (1)
9:22
patrolman (13)
12:11;13:12;14:15,
16,21;20:21;21:25;
22:8,10,18;29:11;
30:24;53:25
pattern (1)
47:11
pause (1)
33:7
pay (3)
10:13,14;36:21
peace (1)
9:16
penetrated (1)
37:15
penis (2)
37:21;60:24
Penzato (3)
75:17,22;79:6
people (10)
9:3;22:3;23:22;
24:8,23,25;50:17,19;
58:5,11
per (2)
9:12;30:5
performing (1)
60:21
period (1)
17:12
permitted (1)
4:7
perpetrators (2)
17:10;20:10
person (7)
14:4;21:3;22:1;
39:2;41:4,10,12
personally (2)
13:25;14:10
persons (1)
45:11
person's (1)
55:11

person-to-person (1)
21:1
phone (7)
55:24;57:11;63:9;
64:7;65:23,25;66:5
phones (1)
63:9
physical (1)
73:5
physically (1)
74:10
pick (1)
52:22
picking (1)
75:20
piece (1)
47:21
place (9)
25:5;36:23;51:8,
11;52:7;62:10;64:14;
72:21;77:10
placed (5)
73:11,15;76:16,21,
25
plaintiff (1)
77:8
plaintiff's (1)
75:9
platforms (1)
63:11
please (2)
5:6,23
pm (2)
51:21;79:21
pod (1)
7:15
point (13)
22:12;31:12,18;
39:10;46:14,16;47:5;
48:20;55:23;60:20;
61:3,4;74:4
Police (20)
5:12;6:1,10,13;7:1,
4;9:17;11:8;14:13;
15:4;21:19;33:14;
34:3,4;35:2;41:16;
52:4;53:18;63:22;
73:12
police-type (1)
6:12
policy (3)
27:11;41:16,20
polygraph (1)
55:14
portion (1)
64:12
position (2)
11:23;12:1
possession (1)
23:9
possibilities (1)
28:25
possibly (1)

74:23
POST (2)
5:25;6:1
potatoes (1)
13:13
potential (1)
23:13
power (1)
30:7
practice (6)
30:6;40:22;43:3;
53:17;54:25;63:10
preference (1)
65:21
prejudge (2)
54:18,20
preliminary (2)
9:21;12:7
preparation (1)
16:7
prepare (5)
40:20,23;42:9;
43:5;58:9
prepared (5)
34:20;35:4;70:7,
13;78:11
presence (2)
45:8;46:8
present (3)
49:2,2;58:10
presented (10)
12:23;46:17,19;
48:9;55:2;63:8;
65:15;70:22;71:24;
78:21
pretty (1)
59:13
preview (1)
70:9
previously (1)
62:24
print (1)
70:8
printed (1)
70:9
prior (17)
7:20,22;11:19;
17:20;20:1;23:25;
25:8;28:19;37:13,16;
42:11,25;43:3;44:16;
69:7;74:8,16
probable (11)
26:5;40:21,25;
72:9;74:17;75:16;
77:21,24;78:4,12;
79:7
Probably (6)
15:16;30:18;33:22,
23;38:14;69:4
Probation (1)
77:2
procedurally (1)
21:24

Procedure (2)
4:6;56:23
procedures (1)
27:11
proceeded (1)
60:15
proceeding (1)
78:5
proceedings (1)
78:8
process (5)
20:11;27:20;55:9;
57:17;73:19
processing (1)
16:5
produce (1)
17:25
produced (3)
65:14,21,22
produces (1)
55:3
production (1)
38:17
Professional (3)
4:23;6:5;18:16
proficient (1)
20:13
program (1)
8:15
progress (1)
26:6
proper (2)
4:12;26:21
prosecution (6)
57:2,4,19;58:13,
19;75:21
prosecutions (1)
58:6
prosecutors (2)
59:4,6
protection (1)
6:15
provide (3)
24:19;46:15;62:19
provided (3)
60:7,10;67:18
provides (1)
15:23
providing (1)
62:14
Public (4)
15:13,20,21;60:4
Purely (1)
23:19
purposes (1)
4:7
pursuant (2)
4:5;14:1
pursue (1)
55:6
put (2)
69:20;71:20
putting (1)

16:6

R

rape (24)
12:6;13:23;14:6,
22,25;20:15;21:20;
44:4,7;47:14,15,16,
20;48:2,4,5,11,19,24;
72:10,16;79:2,13,15
raped (2)
20:17;53:1
rather (1)
76:4
reach (1)
24:14
reached (1)
26:9
read (5)
4:9;36:8;48:1;
59:24;65:9
re-address (1)
21:14
READEAU (12)
4:5;5:1,7,20;18:12;
34:1;41:11;60:3;
63:19,20;69:18;
78:23
readily (1)
25:12
Reading (6)
36:10;59:18;60:2;
61:25;65:10;67:12
realize (1)
22:3
really (4)
6:24;9:11;13:21;
58:18
reason (2)
40:15;55:15
reasons (1)
30:6
recall (19)
12:21;13:24;17:18,
22;31:9;32:19;38:8;
39:25;46:1,22,24,25;
47:8,11;61:24;65:10;
68:19;71:9;77:1
recalled (1)
12:18
recanted (1)
54:2
received (2)
9:19;21:6
receiving (3)
31:17;37:18;74:8
RECESS (1)
18:3
recognize (2)
64:4;69:4
recollection (2)
34:22;35:14
record (5)

5:6;17:23,25;
47:24;54:22
records (1)
26:14
recover (1)
63:15
recused (1)
57:12
RE-EXAMINATION (1)
78:17
refer (4)
35:1,13;36:5;65:19
reference (3)
19:13;57:8;74:23
references (1)
19:9
referred (2)
43:5;63:22
referring (2)
18:7;61:14
refresh (1)
35:19
refused (1)
57:3
regard (6)
14:25;16:10;20:13;
69:5;73:7;78:19
regarding (1)
34:4
regardless (2)
45:23;46:25
regards (1)
64:13
Registered (1)
4:22
regularly (1)
28:3
Reid (6)
16:15,16,17;17:10;
18:11,13
R-e-i-d (1)
16:17
relationship (2)
32:1;36:25
relationships (1)
40:13
relative (1)
40:19
relay (1)
13:15
relays (1)
67:10
released (1)
73:24
relevance (2)
44:22;45:9
relevant (1)
24:5
relieve (1)
75:3
remand (1)
76:4
remember (11)

10:21;11:12;12:17;
15:11;30:19;32:23;
35:14;44:14;57:10;
59:18;68:19
removed (1)
61:1
rendered (1)
32:18
rent (1)
36:21
rental (1)
36:22
replaced (1)
38:13
report (26)
8:12;16:6;21:9;
33:9,10,15;34:3,8,11,
14;35:17;36:2;39:10;
40:1,8;48:14;51:13;
52:5,14;53:8;56:11;
63:21,23;68:23;75:2,
12
reported (1)
52:6
Reporter (2)
4:21,23
reporting (1)
21:3
reports (1)
8:17
represent (1)
5:22
reprimanded (1)
10:16
request (6)
43:5;58:9;59:7;
62:17,20;76:12
requested (1)
62:18
requests (1)
76:11
required (1)
28:14
reserved (1)
4:16
residence (2)
36:21;46:17
respond (5)
13:16;14:18;21:5;
30:4,9
responded (3)
13:2;30:12;34:18
responding (5)
13:9,12;20:21;
21:6;28:23
responds (1)
12:14
response (6)
12:10;13:10;32:19;
46:7,8;66:22
responsiveness (1)
4:15
result (8)

75:11
**retained (1)**
4:11
**returning (1)**
37:12
**review (9)**
21:5,7,7;59:15;
68:17;70:5,16;71:8;
79:13
**reviewed (4)**
48:18,22;66:5;
70:10
**reviewing (2)**
38:7;68:20
**Revised (1)**
48:18
**ride (1)**
52:22
**right (14)**
4:9;18:1;27:4;
28:20;29:21;35:12;
38:24;41:1,13;45:3,
24;47:8;56:4;74:20
**rights (2)**
46:13;60:7
**Robin (39)**
4:11;5:4,22;18:5,9,
19;20:6;25:11;26:15;
27:14;33:13,18,25;
35:22;36:3,6;37:25;
38:16,23,25;39:11;
41:23;42:6;44:1;
49:17;50:8,12;59:5,
10,20;63:18;64:3;
66:19;68:2;69:14;
72:12;78:18,25;
79:19
**role (4)**
6:15;17:5;76:24;
77:9
**roof (1)**
50:17
**room (16)**
20:25;29:23,24,25;
31:11;35:21;37:8;
44:20;45:1,8,11;
51:4;60:12,14;62:5,7
**rooms (2)**
29:20;64:17
**rule (1)**
54:17
**Rules (1)**
4:6
**run (1)**
23:24
**running (1)**
37:23

**S**

**safety (1)**
30:6
**said/she (1)**

42:24
**salt (1)**
65:16
**same (12)**
9:16;11:25;29:4;
32:4;36:2;42:23;
49:23;50:17;54:15;
59:13;60:7;75:8
**sandwich (1)**
61:6
**saw (1)**
63:8
**saying (5)**
19:15;41:12;46:1
**scene (2)**
16:5;23:8
**school (1)**
5:24
**Scott (1)**
70:18
**screened (1)**
56:24
**se (1)**
9:12
**search (14)**
16:8;26:11,13;
29:1,3,5;46:5,18,19;
63:15;65:20;71:18,
21;72:4
**second (2)**
38:1;68:21
**secure (1)**
37:4
**security (2)**
6:14;23:23
**seek (8)**
21:16;24:16;26:18;
28:2;29:5;41:2,5;
42:2
**seeking (4)**
25:8;40:13;42:11;
44:16
**seem (1)**
24:24
**seemed (1)**
40:9
**selectively (1)**
63:12
**semesters (1)**
5:24
**send (1)**
27:1
**sending (1)**
71:12
**sensation (3)**
31:17;32:9;37:18
**separate (2)**
37:7;64:17
**separation (1)**
11:15
**series (2)**
66:2;67:10
**serious (3)**

66:14;79:12,15
**Seriously (1)**
66:22
**service (4)**
11:15,19,20;14:18
**session (1)**
15:17
**sessions (1)**
19:12
**set (2)**
75:22;76:1
**seven (1)**
26:13
**seven-and-a-half (2)**
6:9;10:8
**several (5)**
12:15,18;19:12;
24:6;67:6
**sex (6)**
31:18;37:18;45:5;
60:21;61:2;67:21
**sexual (21)**
8:12;31:13;32:10;
37:9,17;39:13;44:20,
22;45:2;47:18;48:17,
21,23;50:25;60:20,
22;62:25;67:8;68:1,
11;79:7
**sexually (1)**
12:24
**shared (4)**
36:13,20;37:6;
60:13
**Sheriff's (24)**
6:8;7:7,10,20,22;
10:1,6,9,15;11:2,4,9,
13,22;12:1,2,3,8,16;
13:4,22;14:2;15:6;
53:19
**shirt (1)**
37:23
**short (1)**
60:14
**shortly (2)**
71:12;74:25
**show (6)**
24:19;26:24;28:5;
34:1;46:5;69:3
**showed (2)**
66:1,2
**shows (2)**
12:11;67:4
**sic (1)**
76:13
**side (2)**
6:25;43:13
**sign (1)**
4:10
**signed (5)**
18:17;60:7;71:14;
72:2;77:25
**similar (1)**
27:20

**simple (13)**
47:14,15,16;48:2,4,
11,19,24;72:10,16;
79:2,13,15
**sincere (1)**
40:16
**sister (4)**
44:10;46:7;49:1;
51:3
**sister's (1)**
36:11
**sit (4)**
5:19;28:4;56:19;
77:20
**sitting (3)**
41:12;75:9;78:9
**situation (3)**
14:6;22:2;37:20
**six (1)**
26:13
**sleep (2)**
37:14;39:17
**sleeping (2)**
32:3;39:3
**slept (1)**
37:7
**Slow (1)**
36:16
**small (1)**
9:16
**software (1)**
70:8
**solo (1)**
28:5
**somebody (5)**
13:15;20:15,17;
39:13;54:21
**Sometime (1)**
37:13
**Sometimes (5)**
23:14,16,17;43:17,
18
**somewhere (2)**
38:14;52:9
**soon (1)**
75:14
**sorry (2)**
36:19;60:17
**sort (2)**
31:16;78:5
**sought (3)**
48:8;53:13;66:9
**speak (1)**
22:1
**specific (4)**
15:12;17:8;19:14;
71:10
**specifically (7)**
17:1,22;34:13;
35:16;38:8;46:13;
63:16
**specifics (2)**
10:21;59:18

**spelling (1)**
70:11
**spoke (1)**
49:1
**spray (1)**
8:10
**St (4)**
6:8;7:6;60:5;73:24
**stages (1)**
13:11
**stake (1)**
58:4
**start (2)**
23:21;24:2
**started (2)**
11:14,16
**State (1)**
4:22;31:16
**stated (7)**
60:17,18,23;61:3,7,
25;67:6
**statement (18)**
21:1,2,8,14;24:20;
41:4;46:15,23;47:1,
10;60:8;62:14,19,21;
65:3,3;67:18;68:12
**statements (7)**
26:12;53:24;55:4,
8;64:20;68:25,25
**States (1)**
6:7
**stating (1)**
61:1
**station (1)**
52:4
**Statutes (3)**
48:18,23;79:14
**stay (3)**
12:3;36:23;62:1
**stayed (2)**
52:23,25
**step (5)**
25:21,22,22,22;
70:2
**steps (2)**
25:21;28:11
**still (3)**
11:24;37:4;54:23
**stipulate (1)**
75:2
**stipulated (1)**
4:3
**stipulating (1)**
75:12
**stop (7)**
14:3,4;27:4;38:1;
40:6;41:13;61:12
**stopped (2)**
40:4;60:25
**story (4)**
41:25;42:23;43:13;
45:14
**straight (1)**

21:21
**Street (3)**
36:12;52:10,11
**strictly (2)**
17:6;25:2
**strike (1)**
77:19
**stripped (1)**
39:22
**struggle (1)**
72:24
**stuff (2)**
9:10;27:12
**subject (3)**
17:3,6;39:8
**submission (2)**
16:7,7
**submit (2)**
40:23;42:10
**submitted (2)**
38:14;70:16
**submitting (2)**
8:17;43:6
**subpoena (1)**
78:8
**Subsequent (1)**
15:2
**subsequently (1)**
9:23
**substantive (1)**
50:22
**successful (2)**
19:17;58:6
**successfully (1)**
18:13
**suggestion (1)**
28:14
**suited (1)**
48:19
**supervise (1)**
9:4
**supervision (1)**
7:16
**supervisor (12)**
11:24;12:12,13;
13:1,1;22:11,18;
26:2;27:1,16;30:4;
69:25
**supervisors (1)**
19:13
**supplemental (3)**
34:19,22;35:3
**supplies (1)**
8:19
**supposed (1)**
49:24
**sure (7)**
19:10;24:3;35:18;
36:4,7,9;59:17
**surrounded (1)**
9:3
**surroundings (1)**
37:20

**surveyor (1)**
13:20
**suspect (2)**
23:9;43:17
**suspects (3)**
17:10;24:9;54:19
**SWAT (1)**
6:22
**sworn (1)**
5:2
**system (2)**
14:3,5

**T**

**tactical (1)**
6:17
**tactics (2)**
8:9,9
**talk (2)**
21:8;45:18
**talked (3)**
45:16;63:3;69:10
**talking (6)**
14:8,11;45:22;
46:11;49:18;77:1
**Tammany (4)**
6:8;7:6;60:5;73:24
**tangible (1)**
53:23
**TASER (1)**
8:11
**taught (1)**
17:9
**team (2)**
6:22;28:6
**tears (1)**
40:10
**Technique (5)**
16:17;17:8,9,11;
18:14
**techniques (2)**
19:2,14
**telling (3)**
31:9;46:22,25
**tells (1)**
39:13
**tendering (1)**
18:8
**tested (2)**
11:18,19
**testified (2)**
5:2;41:2
**testify (2)**
58:14;75:3
**testimony (4)**
4:4;53:7;55:18,20
**texting (1)**
64:15
**texts (1)**
67:10
**Thanks (1)**
58:24

**thereafter (1)**
75:1
**therefore (1)**
50:2
**thermal (1)**
37:23
**third (1)**
47:19
**though (3)**
32:20;45:19;52:25
**thought (2)**
37:16;50:21
**thousands (1)**
26:13
**three (4)**
5:24;7:8;18:22;
19:21
**three-day (1)**
18:20
**three-hour (1)**
19:24
**timeline (1)**
54:1
**times (1)**
67:7
**tipped (1)**
54:9
**title (1)**
5:16
**toaster (1)**
58:5
**today (4)**
56:19;75:9;77:20;
78:9
**together (2)**
16:6;37:4
**told (20)**
10:25;19:11;32:3,
9;35:14;40:2,3,12;
43:9;44:9;47:9;
48:14;53:2,8,25,25;
59:1;61:21;66:24;
75:15
**took (8)**
13:2;19:23;25:5;
51:11;58:3;62:10;
64:14;71:18
**top (3)**
31:13;37:20;60:12
**touch (1)**
57:13
**tracking (1)**
9:7
**traffic (3)**
14:3,19;52:17
**trail (1)**
26:7
**trained (6)**
14:25;39:19,20;
54:14;55:13,16
**training (31)**
6:23;7:3,21;8:1,4,
5,8,14,16;9:14,14,17,

22;14:24;15:9,10,13,
17,20,23,25;16:1,10,
13,23;19:4,12,13,20;
54:3;62:15
**transport (1)**
73:16
**transported (2)**
73:12,23
**trial (1)**
4:16
**tried (1)**
11:20
**trier (1)**
40:19
**trouble (3)**
65:5,6;68:13
**trundle (1)**
37:7
**try (2)**
51:9;63:15
**trying (2)**
24:24;25:2
**Tuesday (1)**
11:13
**turn (1)**
27:15
**twin (1)**
37:7
**two (18)**
12:19,20;19:21;
22:14;30:5,7;34:23;
36:13,20;37:2;42:22;
45:11;52:17;60:19,
20,22;79:9,12
**two- (2)**
19:24;52:16
**type (3)**
6:12;9:13;13:5;
32:17;33:5;39:3;
73:5,6,18
**typically (5)**
20:19;21:7;24:10;
28:6;30:9
**typing (1)**
35:9

**U**

**ultimate (1)**
76:13
**ultimately (1)**
48:24
**unclothed (1)**
37:22
**uncomfortable (1)**
29:23
**under (8)**
4:6,7;11:4;32:16,
21;39:3;45:4;50:17
**underwear (1)**
37:24
**undoubtedly (1)**
28:9

**undressed (5)**
32:12;38:5;39:2,5,
16
**unit (1)**
6:20
**United (1)**
6:7
**units (2)**
7:16;73:12
**unknown (1)**
62:6
**unless (2)**
35:13;50:21
**unusual (2)**
39:1;60:16
**unwilling (1)**
33:4
**up (16)**
8:18;12:11;24:5,
19;26:5;31:18;37:3,
19;39:24;40:24;46:5;
51:16;52:23;63:14;
69:4;75:20
**upon (8)**
11:9;25:24;37:19;
45:21,25;47:7;65:11;
78:10
**upset (2)**
33:4;40:9
**use (3)**
8:12;47:19;70:8
**used (2)**
73:1,6
**user (1)**
65:11
**usually (5)**
12:12;13:10,12;
22:16,21

**V**

**vagina (2)**
37:21;60:24
**vaginally (1)**
37:15
**valid (1)**
14:4
**value (1)**
43:1
**varies (1)**
26:9
**various (1)**
6:2
**vastly (1)**
27:24
**verbal (1)**
60:7
**verbatim (1)**
35:16
**verge (1)**
40:10
**version (1)**
66:7

via (2)
62:2;63:13
victim (74)
13:7,18;16:24;
17:1;21:2,10,12,13,
18,19;22:19;23:7,11;
24:11,12;26:16,17,
18,22,23,24;28:24;
29:7;30:21;31:4,9;
35:14,23;37:2,6,10,
14,15;41:25;42:7;
43:21;45:10;47:20;
48:6;51:9;52:18;
54:6,10,17,24;55:1,5,
19,22;56:14,17,19,
25;57:3,15;60:13,15,
18,22;61:1,2,7,15,21;
62:2,4,5;64:7,21;
65:4,25;66:21;68:25;
73:18
victimized (1)
67:3
victims (7)
16:4,11;17:9;
20:10;24:9;53:22;
54:20
victim's (3)
60:24;62:23;63:9
video (3)
38:7,9,18
videoed (1)
29:10
videotaped (1)
29:8
violated (2)
66:21;67:2

**W**

wait (1)
33:21
waiting (1)
52:22
waives (1)
4:9
wake (1)
31:18
waking (2)
37:19;39:23
walks (1)
21:19
walkthroughs (1)
8:20
warrant (52)
14:1,5;24:17;25:8;
26:19;29:1,4,4,5,6;
41:2,5;42:2,10,12;
43:2,5,18,23;44:16;
46:2,6,6,18,19,20;
47:3,5;48:8,9,17;
53:13;65:20;69:21,
24;70:3,5,12,23;71:3,
7,11,14,15,16,18,22;

72:4,5,7,15;78:20
warrants (8)
16:8,8;26:11,13;
28:19;40:24;58:10;
63:15
way (8)
22:2;54:2;58:22;
65:6;67:3;70:7;
75:25;76:3
wearing (1)
37:23
Wednesday (1)
11:14
week (1)
15:18
weeks (2)
8:15;57:14
whatnot (1)
74:25
what's (4)
21:9;33:12;52:8;
68:23
whatsoever (1)
73:6
wherein (2)
37:1;48:5
White (3)
34:14,16;54:8
Whitehead (9)
27:17,18;28:10;
29:15;30:2,4,11;31:1,
6
whole (1)
10:3
window (2)
51:12,17
withdrawn (1)
51:5
Within (3)
7:8;43:8;55:15
Without (4)
38:7;45:22;47:18;
67:12
witness (16)
4:4,9,24;16:24,24;
17:1;18:10;21:2;
25:6,8;36:18;49:12,
16,21;55:1,5
witnesses (10)
16:4,11;17:9;
20:10;23:13;24:9,13,
15;53:22;54:20
woke (1)
51:16
woman (1)
12:22
women (1)
40:13
words (2)
17:7;78:5
work (7)
6:6,12;7:4,10;8:25;
28:7;37:12

worked (1)
28:18
worth (1)
33:9
writing (2)
8:12,17
written (1)
54:16
wrong (1)
64:18

**Y**

Y'all (2)
38:20;46:11
years (6)
6:3,7,9;10:8;17:17;
27:24
Yep (1)
11:6

**0**

0130 (3)
37:13;51:16,24
02 (2)
7:9,9
0245 (1)
52:6
09 (2)
11:11;14:13

**1**

1 (4)
6:1;25:21;34:7;
52:17
1:30 (1)
51:25
10 (3)
18:4,15,21
11 (3)
51:19,20,21
12 (1)
8:15
12:38 (1)
79:21
13 (1)
34:7
13-page (1)
34:8
15 (3)
6:3;35:2;52:19
16 (1)
37:10
16th (1)
60:9
17 (5)
5:14;17:21;20:1,
12;78:12
17th (1)
60:10

**2**

2 (2)
5:25;25:22
200 (1)
9:3
2004 (1)
11:21
2009 (2)
6:10;10:10
2014 (4)
18:4,15;36:13;37:1
2015 (10)
5:14;17:21;20:1,
12;37:3,9,10;60:3,10;
78:13
22nd (2)
57:12;70:20
23 (2)
51:14,18
2300 (1)
60:11
2315 (1)
37:13
2340 (2)
37:11;51:15
26th (1)
60:3
2nd (2)
37:3,9

**3**

3 (1)
25:22

**4**

4 (3)
25:22;35:2,5
40 (1)
15:18

**5**

5 (2)
35:5;59:21

**6**

6 (2)
30:18;35:5
645 (3)
36:11;52:10,11

**7**

7 (1)
35:5
7:00 (1)
30:18
70435 (1)

5:8
74458 (1)
5:7

**8**

8 (3)
18:4,15,20
80 (2)
77:7,10
85 (2)
77:7,10

**9**

9 (2)
18:20;35:5